**ROBINSON et al. v. HAYNES et al.**

No. 19569. Opinion Filed Dec. 2, 1930.

Rehearing Denied Jan. 12, 1931.

D. B. Horsley and Hargis & Yarbrough, for plaintiffs in error.

J. C. Cornett and Hadwiger & Hadwiger, for defendants in error.

CULLISON, J. This case comes on appeal from the district court of Osage county, Okla., wherein the plaintiff Hattie May Haynes instituted an action against Chas. M. Robinson, executor of the last will and testament of Sarah J. Napier, deceased, and others, to secure specific performance of an oral contract to devise property. From a judgment in favor of plaintiff, defendants appeal.

The parties to this appeal will be referred to as they appeared in the court below.

The pertinent facts, as disclosed by the record, and out of which this controversy arose, are as follows:

In the year 1905, Viola McIntee, mother of the plaintiff Hattie May Haynes, obtained a divorce from her husband, and, under the decree of divorcement, the custody of the McIntee children, one of which is the plaintiff, Hattie Haynes, was awarded to the mother, Viola McIntee. Mrs. McIntee later became married to one Dr. Burnett, a brother of Sarah J. Napier and a cousin of John W. Napier, whose estates form the subject-matter of this action.

It appears from the record that on or about October 11, 1907, Mrs. Burnett, the former Viola McIntee and mother of plaintiff, was requested by J. W. Napier and Sarah J. Napier, his wife, who were visiting in the Burnett home at that time, to give to them, the Napiers, the plaintiff herein; that said request was earnestly renewed from time to time during the visit of the Napiers in the Burnett home and finally ripened into negotiations in earnest between the mother of plaintiff and J. W. Napier and his wife, Sarah J. Napier; that, as a final result of these negotiations, the mother of plaintiff herein finally agreed to permit the Napiers to take plaintiff to their home and treat her as their own child, the Napiers agreeing to educate plaintiff and make a home for her; the consideration

therefor being at their deaths, they, J. W. and Sarah J. Napier, would give plaintiff any and all property of which they might die seized.

The record further shows that, in accordance with such agreement, the plaintiff immediately went to Iola, Kan., to live and make her home with the Napiers; that the Napiers together with plaintiff later moved to Pawhuska, Okla., where plaintiff attended school and assisted Mrs. Napier in the care of the Napier home and also assisted Mr. Napier in the conduct of his business.

It also appears from the record that after plaintiff went to live with the Napiers, plaintiff was at all times treated by them, the Napiers, with the same love and affection that natural parents would bestow on their own children, and that the Napiers at all times provided for plaintiff the best of clothes, care, and education that was available to them.

On November 13, 1923, John Napier died, intestate, and Chas. Robinson, one of the defendants herein, was named administrator of John Napier's estate. Administration proceedings were duly had, at which plaintiff made no appearance. By decree of the county court, Mrs. Sarah Napier was declared the sole heir of John W. Napier and the right, title, and interest in and to all of his property vested in Mrs. Napier.

February 2, 1926, Mrs. Sarah Napier died, testate, and in her will of July 14, 1926, devised the property over which this litigation arose to certain friends named in the will, giving as a reason therefor the loyalty and fidelity of said friends during the last years of her life.

On April 30, 1926, the will of Sarah Napier was admitted to probate.

On May 11, 1926, plaintiff filed her petition in the district court of Osage county, Okla., wherein she prays:

"That said Chas. M. Robinson, as the executor of the estate of Sarah J. Napier, deceased, be restrained and enjoined from distributing or disposing of any part of said estate, except for the purposes of paying the debts of said estate and the costs of administration pending final determination; that a receiver be appointed to take charge of the rents and incomes from said above-described property and account therefor to this court subject only to the payment of the debts of said estate and the costs of administration by order of the county court of Osage county, Okla., or that the defendant, Chas. M. Robinson, executor of the estate of Sarah J. Napier, deceased, be required to give a good and sufficient bond for double the amount of the reasonable rental value, likely to accumulate during this litigation in the sum of $2,000, and that plaintiff have her costs."

The plaintiff in the trial court, and in this court on appeal, predicates her action on the equitable right to enforce specific performance of the oral contract, above referred to, and asks that the title to the personal and real property of which said Sarah J. Napier died seized be quieted in plaintiff, subject to the costs of administration and costs of this action, and that the defendants (beneficiaries under the Sarah Napier will) be decreed to have no right, title, or interest in and to any of the property of which Sarah Napier died seized.

The trial court, after a full and complete hearing on the merits of the case, rendered judgment in favor of plaintiff, decreeing title in her to all the property of which John W. Napier and Sarah Napier died seized, save and except that portion which was necessary for payment of their debts, which included administrators' and executors' fees.

To reverse this judgment the defendants, beneficiaries under the Sarah Napier will, bring this case here on appeal, relying upon numerous errors alleged to have been committed by the trial court, both as to the facts and the law.

The defendants complain of many errors. We have examined the errors complained of and find them to be the usual errors alleged by litigants appealing to this court.

Under the view that we take in this case, we are of the opinion the controlling issues presented by this appeal are embodied in the following interrogatories:

First:

(a) Will a court of equity grant a specific performance of an oral contract or agreement to devise property?

(b) If so, upon what conditions and under what circumstances?

Second:

Under the record herein, was the trial court, sitting as a court of equity, warranted under the law and the evidence in granting specific performance of the alleged oral contract to devise property, pleaded by plaintiff herein?

The above questions will be answered in the order set forth above.

First:

(a) Will a court of equity grant specific performance of an oral contract or agreement to devise property?

Whether equity will decree the specific

performance of a contract rests entirely in judicial discretion, and always upon the facts of the particular case. Hennessy v. Woolworth, 128 U. S. 438, 9 Sup. Ct. 109, 32 L. Ed. 500. Before relief will be granted it must appear that good conscience and natural justice requires it.

There is no rule of public policy which forbids the making of an agreement to dispose of property in a particular manner by will. Edson v. Parsons, 155 N. Y. 555, 50 N. E. 265; Johnson v. Hubbell, 10 N. J. Eq. 332, 66 Am. Dec. 773.

As announced in 25 R. C. L., it is well settled that, subject to certain well-defined conditions and requirements, a person may make a binding oral agreement to devise property, and that a court of equity will grant specific performance of such an oral contract. In the above text, at page 310, it is stated:

"Certainty of Terms of Agreement. It is well settled that to warrant the court in decreeing the specific performance of a contract to devise or bequeath property to the complainant, the contract must be definite and certain." (Wall's Appeal, 111 Pa. 460, 5 Atl. 220). "But such an agreement need not expressly stipulate that the promisor should make a will. * * * The evidence to sustain such an agreement must in all particulars be clear, positive, and convincing, and the performance relied on as the basis of the desired relief must likewise be proved by clear and sufficient evidence." 25 R. C. L. sec 124, p. 310.

It is well settled that such agreements are capable of enforcement after the promisor's death as against his estate and his personal representatives.

"It is settled by a line of authorities which are practically uniform that while a court of chancery is without power to compel the execution of a will, and therefore the specific execution of an agreement to make a will cannot be enforced, yet, if the contract is sufficiently proved and the usual conditions relating to specific performance have been complied with, then equity will specifically enforce it after the promisor's death by seizing the property which is the subject-matter of the agreement, and fastening a trust on it in favor of the person to whom the decedent agreed to give it by his will. There is no doubt therefore but that such an agreement is capable of enforcement after the promisor's death as against his estate and his personal representatives. Such agreements may also be enforced as against the heirs of the decedent, especially when they inherit only by reason of a remote relationship, and as against his devisees, and, in general, against all those who acquire the property without consideration. Crawford v. Wilson, 139 Ga. 654, 78 S. E. 30; Anderson v. Anderson, 75 Kan. 117, 88 Pac. 743." 25 R. C. L. 311.

It is also well settled that "public policy does not prohibit the making of agreements by parents for the surrender of their children to strangers for nurture and rearing in consideration of services which the children may render, and such agreements may provide that the foster parents shall make testamentary provision for such children." Anderson v. Anderson, 75 Kan. 117, 88 Pac. 743; 25 R. C. L. 312.

We are not unmindful of the rule of law that:

"Agreements under which a child is taken into a family and promised testamentary benefits in consideration of services and affection must, like other contracts, meet the requirements of the statute of frauds, and a parol promise by a person to leave all his property, including real estate, to a child in consideration of her becoming a member of his family and taking his name is void under the statute of frauds." 25 R. C. L. 312.

However:

"Performance of the oral contract or agreement of adoption and the rendering of stipulated services may take the case out of the operation of the statute, and it has accordingly been held that an agreement by a man and his wife to adopt a child, provide and care well for it, and leave it their property at their death, is enforceable as to the property, upon their death after full performance by the child." Sharkey v. McDermott, 91 Mo. 647, 4 S. W. 107; 25 R. C. L. 312.

It is also recognized by the great weight of authority that an agreement to give a child a share in the estate of the person adopting in consideration of the surrender of the child by its parents may be enforced in equity, although the agreement is not in compliance with the customary or statutory mode of adoption, and a suit for such purpose may be brought by the child in his own name. Crawford v. Wilson, 139 Ga. 654, 78 S. E. 30; 25 R. C. L. 313, and cases cited therein.

"Such contracts may be enforced after the death of the promisor as against his estate, especially when the promisor has no child of his own." 25 R. C. L. 313; Anderson v. Anderson, 75 Kan. 117, 88 Pac. 743.

The policy of the courts is to support as far as possible such agreements, which have for their object the amicable settlement of doubtful rights of the parties, and such agreements, when fairly entered into and

falling within the general principles of equity, may be specifically enforced.

(b) Upon what conditions and under what circumstances will a court of equity grant specific performance of an oral contract to devise property?

It is equally well settled that before a court of equity will grant specific performance of an oral agreement to devise property, certain conditions and requirements, hereinafter set out, must be established by clear, cogent, unequivocal, and decisive evidence. In Pancoast, Adm'r, v. Eldridge, 134 Okla. 247, 273 Pac. 255, this court held:

"Before a court of equity will specifically enforce an oral contract to devise property, the proof of the contract must be so cogent, clear, and forcible as to leave no reasonable doubt as to its terms and character."

To the same effect see Teuscher v. Gragg, 136 Okla. 129, 276 Pac. 753; Hayden v. Dannenberg, 42 Okla. 776, 143 Pac. 859; Boles v. Akers, 116 Okla. 266, 244 Pac. 182.

These necessary conditions and requirements precedent to the granting of specific performance of an oral contract to devise property which, under the law, must be proven by cogent, clear, and decisive evidence, are:

(1) The terms of the oral contract to devise property must be reasonably certain.

(2) The oral contract to devise property, like any other agreement for the conveyance of lands, must not violate the inhibitions imposed by the statute of frauds.

(3) If the contract is an oral one to devise land and is reasonably certain, equity may decree specific performance, if there has been such a part performance as will take a parol agreement to convey land out of the statute of frauds.

See 25 R. C. L. sec. 8, and cases cited therein.

### Second:

Under the record herein, was the trial court, sitting as a court of equity, warranted, under the law and evidence, in granting specific performance of the alleged oral contract to devise property pleaded by plaintiff herein?

Tested by the established standards, above, can it be said that, under the record herein, the trial court, sitting as a court of equity, was warranted, under the facts and the law, in decreeing specific performance of the alleged oral contract to devise property pleaded by plaintiff herein?

The answer to this question necessitates a review of the evidence.

The contract or agreement by which plaintiff seeks to charge the estate of John W. and Sarah J. Napier was established by the testimony of many competent witnesses.

Mrs. Burnett, formerly McIntee, mother of plaintiff, called as a witness on behalf of plaintiff, testified as follows (C.-M. 95):

"Sadie Napier told me she was in bad health and she certainly would love to take Hattie home with her as her own little girl, and if I would let her take Hattie home with her that she would treat her as her own daughter and give her everything they had at their death, as they had no one to leave their property to, and she just fell in love with Hattie; that was spoken of several times, many times when they were there; but I finally promised her I would let Hattie go, but not let her go home with them at that time because she was in school and I wanted her to wait until that term was over so she might finish that term, and then she would go between Christmas and New Year's, and I told them I would let her go, and the last thing John Napier said when they left, Sadie being present, John said that they expected me to send Hattie to them and that they would do everything in the world for her, send her to school, and educate her, and give her anything they had in the world at their death. * * * 'I expected the Napiers to take her (Hattie) as their child and I relinquished claim to her, because I trusted that they would do what they said they would'."

On cross-examination, Mrs. Burnett, formerly McIntee, testified:

"Q. Well, did he (Mr. Napier) say anything more than that he wanted one of the little girls to take home with him for his own? A. He said he wanted one of them to take home as their own little daughter, and that they would send her to school and educate her and give her everything in the world that she wanted and leave their property to her at their death." (C.-M. 113.)

Dr. Burnett, brother of Mrs. Napier, brother-in-law of John Napier, and stepfather of plaintiff, testified to substantially the same things as Mrs. Burnett.

Mr. August W. Lemp, brother-in-law of plaintiff, testified, in substance, as follows (C.-M. 263):

"Well, Uncle John—we were all sitting in the dining-room of the house there, I never having seen them before, told me that years before, I don't know how many, him and his wife came to Roswell to try to get Mrs. Burnett to let her daughter, Nellie, my wife now, to go back with them, and she would not allow it, being too young she thought, so that they took the oldest daughter, Hattie. And he to'd me that it might have

been a possibility that I would never have met my wife if she had went there. That they took Mrs. Haynes to raise as their own daughter, and they thought of her as much as if she was their own daughter, and that though they were not rich, they had plenty to take care of her in the future; and at that time he turned around and asked Hattie if Marvin was good to her, and told her that she knew or ought to know that she had a home with them whenever she wanted to, that they had plenty to take care of her while they were living and after they were gone and what little they had was to go to her and she knew it. * * * Mrs. Napier, at one time there, said that Hattie was her girl as much as if she had ever had her, herself, that is she thought of her as much as if she was her own child, and that everything that they had was going to go to her, that she had always been a good girl and that she was going to take care of her."

Mrs. Leta Roddy, called as a witness by plaintiff, testified that she lived next to the Napier home in Pawhuska during the time the plaintiff lived with the Napiers, and that the Napiers at all times treated plaintiff just like their own child, and that she (witness) had always believed plaintiff to be an adopted child of the Napiers. (C.-M. 279.)

As further evidence of the relationship and feeling between plaintiff and the Napiers, we submit some excerpts of correspondence from John W. Napier and Sarah J. Napier to the plaintiff and plaintiff's mother, which read as follows:

Letter from John W. Napier to plaintiff (C.-M. 153):

"Fur your old uncle has the dow and is making more, and if you conduct yourself rite, as I want you too, you can have more some day."

Letter from Sarah J. Napier to mother of plaintiff (C.-M. 158):

"I can tell you, and sow can Hattie that wee get along just fine and she dont have too wonder where she will get her next dress. Nor she wont as long as J. W. lives, and I think I will have something fur the kid left if she mines J. W."

To rebut the evidence introduced by plaintiff, defendants called several witnesses who professed to have more or less intimate knowledge of the affairs of the Napiers, and who testified, in substance, that they never heard of any arrangements whereby the plaintiff was to be given all or any portion of the property of the Napiers; and that to their knowledge the Napiers had never made any statement tending to leave such impression.

It is well settled that evidence that witness failed to see, hear, or observe is relevant only when the circumstances are such as properly lead to the inference that the alleged fact would have been seen, heard, or observed by said witness, had it actually existed. Andrews v. State, 159 Ala. 14, 48 So. 858; Johnson v. Wabash R. Co., 259 Mo. 534, 168 S. W. 713; Harper v. Harper, 252 Fed. 39, 164 C. C. A. 151.

Where witnesses are equally credible, the positive evidence that a certain thing was said is of more weight than that of others who say they did not hear the alleged statement. Isaacs v. Strainka, 95 Mo. 517, 8 S. W. 427.

As is said in Ft. Worth & D. C. Ry Co. v. Taylor (Tex. Civ. App.) 153 S. W. 355, whether or not negative evidence has any probative force depends "upon the situation of the parties and the circumstances connected with such situation."

In Harper v. Harper, 252 Fed. 39, 164 C. C. A. 109, the Circuit Court of Appeals for the Fourth Circuit held:

"The mere negative testimony of a neighbor that he observed no impropriety between defendant and plaintiff's wife, was of no probative value, and was properly excluded."

The defense testimony in the instant case in no wise detracts from the efficacy of that offered by plaintiff, and has no probative force.

In the absence of a showing that the circumstances herein were such as would properly lead to the inference that the alleged fact would have been heard by said witness had it actually existed, the fact that these witnesses themselves had never heard the Napiers make such a statement cannot be considered as legal proof that no such statements were in fact made by the Napiers, or that the facts are not as represented by plaintiff's evidence.

The world is full of people who never heard of the proven facts in any lawsuit.

Plaintiffs in error, in their fourth assignment of error, say:

'The judgment and decision of said court is not sustained by the evidence and is contrary to law."

Having previously cited the rule of law controlling the adjudication of such as the instant case, namely:

"Before a court of equity will specifically enforce an oral contract to devise property the proof of the contract must be so cogent,

clear and forcible as to leave no reasonable doubt as to its terms and character"

—we proceed to discuss the evidence.

The record discloses that in accordance with said agreement the plaintiff went to the home of the Napiers to live with them as their own child.

No doubt it was a great trial on the part of the mother to give up her child, and we are of the opinion that great sorrow came into the heart of the little girl, the plaintiff herein, when she was informed that she had been given away; that she was to be deprived of the constant love and companionship of her natural mother, and go into a new and strange home, and to become the child and daughter of the Napiers. But, notwithstanding the mental conditions confronting her, she complied with the solemn agreement entered into by her mother and the Napiers, by the terms of which agreement the mother surrendered to the Napiers the body, care, custody, and future happiness of her child. And in consideration thereof, the said Napiers, and each of them, then and there agreed to take and receive said child, plaintiff herein, as their own child, and that they would give her the care, education, love, and affection of natural parents and be to her a father and mother, the same as if the plaintiff was their natural child, and that it was their intention that at the death of the survivor of the said John W. and Sarah J. Napier, they, the Napiers, whichever of said two persons would be the survivor of the other, would give, devise, and bequeath to said plaintiff all the property, real and personal, of which he or she, John W. or Sarah J. Napier, as such survivor, might die seized and possessed.

The Napiers further agreed with said Viola Burnett, mother of plaintiff, that plaintiff should in all things, including inheritance, be considered and treated by them and each of them the same as though she, plaintiff, was the natural child of them, the Napiers.

The evidence conclusively shows that Mrs. Burnett in compliance with said agreement did, on the first day of December, 1907, at the urgent request of the Napiers, surrender the care, custody, and parental control of plaintiff to the Napiers.

The record shows that Dr. T. N. Burnett, of Clinton, Okla., is a brother of Sarah J. Napier, deceased. The doctor married Viola McIntee, a widow, the mother of this plaintiff and the three other children.

John W. Napier and Sarah J. Napier were of the ages of 58 and 54 years, respectively, at the time they entered into the contract upon which this action is predicated, at which time they had reached the period of advanced age.

They knew and fully realized their span of life would terminate in a few short years. Death had taken from them their only child, a son. They had been deprived of the greatest joy that comes into the life of a father and mother—children of their own flesh and blood. They had labored long and faithfully to acquire property for their comfort and happiness in the closing years of life. They knew they were not leaving any legal heir of their bodies to whom any property of which they might die seized or possessed would descend.

Under the conditions surrounding these two old people, they sought companionship, kindly treatment, and congenial relations with this young girl, plaintiff herein, upon whom they could rely and to whom they were willing to bequeath all the property of which they might die seized or possessed.

It was perfectly natural for these two old people to visit the home of their brother and brother-in-law, Dr. Burnett, where they met and urgently requested the care, custody, and control of this little girl, plaintiff herein, and at that time, during these visitations of several days, promised and agreed, if the mother would give them the child, they would take, rear, educate, and provide for her, as their own child, and that she, plaintiff, should inherit all the property of which they might die possessed.

The record shows that this solemn contract entered into by and between the mother of plaintiff and the Napiers is corroborated by Dr. Burnett, husband of Viola Burnett, stepfather of plaintiff, and brother of Sarah J. Napier.

The evidence further discloses that these two old people were greatly pleased and proud of the fact that they were enabled to secure the companionship of this little girl; they loved, educated, and clothed her well; they wrote many letters to her mother and other friends expressive of the satisfaction and contentment flowing from their association with the child whom they had taken as their own and to whom, at the close of life, they would bequeath all their earthly possessions.

The little girl went into the home of these good people as their child, remained there from childhood to womanhood, under the

parental love and influence of her foster father and mother until her marriage. Plaintiff lacking a few months of legal age at the time of her marriage, the Napiers were well pleased with the choice of a life companion made by plaintiff, and gave their consent to the marriage. The love, respect, and confidential relations existing between the Napiers and the plaintiff did not cease at the time of plaintiff's marriage. Plaintiff married a railroad man who lived in Muskogee, Okla. His run was from Muskogee to Pawhuska, Okla., the home of plaintiff. The husband would make his run from Muskogee to Pawhuska, where he would spend two or three nights out of each week and return to his home in Muskogee. He made the home of the Napiers his stopping place and often the wife, the plaintiff, would come with him. Both were gladly and affectionately received by the Napiers, and these kindly relations on the part of the Napiers and this plaintiff existed and continued down to and until the death of her adopted father and mother, the Napiers.

The above testimony is illustrative of what the record herein contains; it abounds with clear, unequivocal, and decisive evidence establishing that the oral contract sought to be enforced by plaintiff was in fact made; that under the terms of the oral contract plaintiff was to give up her home with her own mother and go into the home of and become as a daughter to the Napiers; and in consideration therefor the Napiers promised to provide for and educate plaintiff, and upon their death devise to plaintiff all of the property of which they might die seized.

Defendants contend that the contract herein fails as a contract of adoption, and that there is no legal or equitable ground upon which the courts may enforce the same. With this contention we cannot agree.

It is well settled that a parol obligation of a person to adopt the child of another as his own, accompanied by a virtual, though not a statutory, adoption, and acted upon by all parties concerned for many years and during the obligor's life, may be enforced in equity upon the death of the obligor by decreeing the child entitled as a child to the property of the obligor. Crawford v. Wilson (Ga.) 78 S. E. 30.

In the body of the opinion in Crawford v. Wilson, supra, the Supreme Court of Georgia used the following language:

"It was said that an agreement to adopt a child is too indefinite to decree such child rights to property as an heir; but it was replied that, where a parent surrenders his child to another who accepts the custody on the promise to adopt the child as his own, it cannot be doubted that the parties intended that the act of adoption, when consummated, would carry with it the right of inheritance, and that equity would consider that done which ought to have been done, and decree the child's right to his inheritance as if formal adoption had taken place."

In the case, Sharkey v. McDermott, 91 Mo. 647, 4 S. W. 107, 60 Am. Rep. 270, the facts were these: A man and wife entered into an agreement to adopt plaintiff as their child and leave her their property when they died, but failed to execute the agreement as to adoption. Plaintiff wholly performed the agreement on her part by living with them and paying them all the attention due from a child to parents for many years. The husband died leaving his property to the wife. Plaintiff continued living with the wife as her child, and upon the death of the wife the court held that the contract was valid and that plaintiff was entitled to specific performance. It was contended there, as it is here, that the statutory mode of adoption had not been complied with, and, therefore, that plaintiff could not recover, but the decision was placed squarely upon the ground that plaintiff's rights depended entirely upon the agreement and the action of the parties under the agreement. The court said:

"This agreement was not merely and solely one to adopt the plaintiff, but was, in part, to leave the plaintiff the property at their death. The fact that the parties, and each of them, may have failed and neglected to execute it, so far as the adoption was concerned, should not, we think, exonerate them from its further obligation to transfer their property."

In Eggstaff v. Phelps, 99 Okla. 54, 226 Pac. 82, this court held:

"Though an agreement may be invalid as a contract of adoption, it may be valid as a contract to make certain testamentary provisions for the obligee, who has fully performed on his part."

The defendants further contend that the plaintiff, Hattie May Haynes, was an infant when the contract was made and entered into; she was not a party to the contract upon which she predicates her claim to relief, and, therefore, cannot sue on the same or obtain any relief thereunder. This contention is fully answered in Crawford v. Wilson (Ga.) 78 S. E. 31, and we quote

with approval the following language used by the court therein:

"The point upon which the parties in this case most seriously differ is the right of plaintiff, who was not a party to the contract upon which she predicates her claim to relief, to bring this suit. The contract was originally made by the plaintiff's grandmother with the assent of her mother, and was afterwards ratified by Mrs. Puckett with the plaintiff's mother. When the contract was made, the plaintiff's father had abandoned his family, and under the statute the father lost his parental control over the plaintiff which survived to the mother. Civil Code, sec. 3021; Sav., etc., Ry. Co. v. Smith, 93 Ga. 742, 21 S. E. 157. It was within the power of the mother to make the contract, and the question is whether the right to enforce it inheres exclusively in her.

"Before adverting to our own decisions, we wish to call attention to the two general rules on the subject of enforcing a contract by a person for whose benefit it was made, though he was not a party to it, known respectively as the English and American rules, the statement and rationale of which is so clearly made by Lumpkin, J., in Sheppard v. Bridges, 137 Ga. 615, 74 S. E. 245. The modern English rule has been thus formulated by Cotton, L. J.: 'As a general rule, a contract cannot be enforced except by a party to the contract; and either of two persons contracting together can sue the other, if the other is guilty of a breach of or does not perform the obligations of that contract. But a third person, a person who is not a party to the contract, cannot do so. That rule, however, is subject to this exception: If the contract, although in form it is with A. is intended to secure a benefit to B., so that B. is entitled to say he has a beneficial right as cestui que trust under the contract, then B. would, in a court of equity, be allowed to insist upon and enforce the contract.' Gandy v. Gandy, 30 L. R. Ch. Div. 57. The rule which obtains most generally in America is that a person not a party to the contract may maintain an action on it if he is a party to the consideration, or the contract was entered into for his benefit; and, if the person for whose benefit a contract is made has either a legal or equitable interest in the performance of the contract, he need not necessarily be privy to the consideration. 9 Cyc. 380. An exception to the general rule that a stranger to a contract deriving a benefit from it, cannot sue upon it, arises when the contract has been so far performed as to change the condition in life of the stranger and to raise in him reasonable expectations grounded on the conduct of the contractor. Waterman on Specific Performance, sec. 54. An illustration of the application of this principle is given by this text-writer as when a gentleman of wealth enters into an agreement with a poor man that the former will take the child of the latter, bring him up in affluence, and leave him certain property, and there is part performance, the child is entitled to have the agreement carried out, 'his right,' says the author, 'being derived, not from the contract itself, but from what has been done under it, and the wrong he will otherwise sustain'."

Defendants also contend that there has been no such performance on the part of plaintiff, under the oral agreement, as to remove the contract from the operation of the statute of frauds.

In Eggstaff v. Phelps, supra, we held:

"The complete performance of an oral contract on the part of the party seeking to avail himself of its benefits takes the case out of the operation of the statute of frauds."

Under the evidence as disclosed by the record herein, it is clear to us that there was such performance on the part of plaintiff as to remove this case from the operation of the statute of frauds.

A case which bears striking similarity to the one at bar is that of Anderson v. Anderson, 75 Kan. 117, 88 Pac. 743. In that case Hilda Anderson brought suit for the specific performance of an alleged written contract between Nels and Palmlund and Cecelia Palmlund, his wife, both deceased, and plaintiff's parents, Pehr Anderson and Nella Anderson, by the terms of which the Palmlunds were to receive her into their home in all respects as their own child, and she was to be left all the property of which they died possessed. Upon issues joined the cause was tried to the court. A decree was rendered holding plaintiff entitled to specific performance, and to be the legal owner of all the property left by the Palmlunds. The Supreme Court of Kansas in affirming the judgment of the trial court said:

"The Palmlunds had no other child. The enforcement of the contract is not, therefore, opposed to public policy, as in those cases where it would result in the exclusion of the children or the wife or husband of the deceased. (Gall v. Gall, 64 Hun, 600, 10 N. Y. Supp. 332.) The opposing claimants are all collateral heirs. These matters are always proper for the consideration of a court of equity. As suggested at the outset, the remedy rests in judicial discretion, and must depend upon the particular facts of the case. The claim that it is against public policy for the reason that it provides for the surrender of the care and custody of the child has no force. The contract had been performed on the part of Hilda Anderson, and her parents as well. The state is

no longer concerned. This is not an action to compel the parents to abide by their part of the contract, nor is it a suit by the parents to secure the custody of a child, as in Chapsky v. Wood, 26 Kan. 650, 40 Am. Rep. 321.

"We cannot agree with the contention of plaintiffs in error that the terms of the contract are incomplete and uncertain. Its terms provided that the Palmlunds were to receive plaintiff (Hilda Anderson) at the age of eight years into their home, to care for, raise and educate her, to have her custody and control; and, in consideration of these benefits and the opportunity thus afforded them to gratify their parental love and to receive her obedience, society and services in all respects as though she were their own child, they agreed that she should be given whatever property they possessed at their death. The parents, in consideration of the future benefits to their child, surrendered the possession and control of plaintiff. She performed her part fully. The contract, then, so far as plaintiff is concerned, has passed from an executory to an executed one. All the authorities to which we have referred sustain the doctrine that a contract of this nature will be enforced when it is not inequitable. * * * The rights of plaintiff depend in no respect upon any contract for adoption, nor upon any claim of inheritance through adoption, but wholly upon contract."

The Kansas court, in Anderson v. Anderson, supra, held:

"Whether equity will decree the specific performance of a contract rests in judicial discretion and always depends upon the facts of the particular case. As a rule, when a definite contract to leave property by will has been clearly and certainly established, and there has been performance on the part of the promisee, equity will grant relief, provided the case is free from objection on account of inadequacy of consideration and there are no circumstances or conditions which render the claim inequitable."

"In an action for specific performance, where the trial court finds upon sufficient evidence that a written contract was made for the benefit of plaintiff between her parents and childless relatives, husband and wife, by the terms of which plaintiff while a child of eight years was to be received into their family and treated as their own child, reared, nurtured and cared for as though naturally born to them, they to receive her services and obedience during her minority, and agreeing that she should receive at their death all the property they died possessed of; that plaintiff had fully performed her part of the contract; that the husband died leaving all his property by will to the wife, who afterward died intestate; a decree for specific performance against the heirs at law of the wife and holding that plaintiff is the legal owner and entitled to the possession of all the property which the wife possessed at her death, will be upheld."

The case of Svanburg v. Fosseen, 75 Minn. 350, 78 N. W. 4, 43 L. R. A. 427, 74 Am. St. Rep. 490, is another very similar one on the facts. The court upheld the parol contract in that case upon the theory that performance on the part of the child had removed the contract from operation of the statute of frauds, and for the reason the services rendered were of such a nature that their value could not be determined by pecuniary standards and the courts could not say that it was not intended by the parties that the services should be so measured. To the same effect see: Brinton v. Van Cott, 8 Utah, 480, 33 Pac. 218; Shahan, Ex'r., v. Swan, 48 Ohio St. 25, 26 N. E. 222; Wright v. Wright, 99 Mich. 170, 58 N. W. 54; Van Tine v. Van Tine (N. J. Ch.) 15 Atl. 249, 1 L. R. A. 155.

The trial court, in the case at bar, in rendering judgment and upon request of attorneys, made findings of fact as follows:

"I find that shortly after the 11th day of October, 1907, the mother of Hattie May Haynes, herein was requested by J. W. Napier and his wife, Sadie Napier, to give the plaintiff herein to these parties, to wit: J. W. Napier and his wife, Sadie Napier; * * * that as a final result of these negotiations, the mother of the plaintiff herein finally agreed to permit J. W. Napier and his wife, Sadie Napier, to take the plaintiff and treat her as their own child, agreeing to educate her and make a home for her, the consideration therefor being that J. W. Napier and Sadie Napier at their death would give plaintiff any property of which they might die possessed. * * * I further find that within the period of some 60 or 90 days after this agreement was made and entered into by and between the parties herein referred to, that the plaintiff herein went to Iola, Kan., to live with J. W. Napier and his wife; that she lived with them there for a period of time, the exact time I don't recall, after which time she came to Pawhuska, Okla., in company with Mr. and Mrs. Napier, and lived with them for a period of about five years, during which time the plaintiff attended school and assisted in a general way Mrs. Napier in taking care of the house. She also assisted to a certain extent Mr. Napier in his books, in the keeping of his books, and that at the expiration of approximately five years, and at a time when the plaintiff was a little less than 18 years of age, she married a man by the name of Marvin Haynes; that at the time of said marriage she secured the consent of J. W. Napier, who gave his consent, signing the same either foster-parent, or foster-fath-

er. * * * I further find, as a matter of fact, that Mr. and Mrs. Napier are deceased, and that Mr. Napier died some two or three years prior to Mrs. Napier, and that Mrs. Napier died on the 2nd day of February, 1926, and at the time of her death she left a will leaving the property over which this litigation arose to certain persons named in the will. * * * I further find that the father and mother of Hattie May Haynes were at that time divorced and not living together, and that Hattie May Haynes was living with her mother at said time. I further find that under the decree of divorce granted in Woods county on the 3rd day of January, 1905, that Hattie May Haynes, the plaintiff in this case, was awarded to the custody of her mother, being the same person heretofore mentioned who entered into the contract with Mr. and Mrs. J. W. Napier. * * * I further find that prior to the death of Mr. Napier he deeded a piece of property to Charles Grant, the father of Viola May Grant, said property being given to Mr. Grant in consideration of the kindness which he had shown to the Napier family. That said property was of the value—is of the value of approximately $1,200; that, at the time of the execution of the deed to Mr. Grant by Mr. Napier, there was a mortgage on the property of $500, which was assumed and has been paid by Mr. Grant. * * * I find that this contract entered into by and between the Napiers and the mother of the plaintiff is a binding contract, and that therefore she is, as a matter of law, entitled to have the contract enforced. * * * The court further finds that the defendant, C. M. Robinson, had no information as to the verbal contract between the mother of Hattie May Haynes and Mr. and Mrs. J. W. Napier until after the will in this case was offered for probate. I take it that he did have some information before the suit was filed. * * * The court further finds, as a matter of equity, that Chas. M. Robinson is entitled to receive from this estate, or from the plaintiff in this case, the sum of $630 for the services rendered in administering upon the estate of J. W. Napier, and for the services rendered as the executor of the estate of Sarah J. Napier. The judgment in this case will be for the plaintiff.

"It is, therefore, ordered, adjudged, and decreed by the court that, as a matter of law, the contract involved was and is a valid and legal contract, to devise and in equity and good conscience should be, and is hereby enforced, and that the plaintiff, Hattie May Haynes, is entitled to all the property owned by the said Sarah J. Napier, who was also sometimes known as Sadie Napier, at the time of her death, including the real estate hereinbefore described in the petition.

"It is further ordered, adjudged, and decreed by the court that the title to said real estate should be and the same is hereby forever quieted in the plaintiff, Hattie May Haynes, and the executor of the last will and testament or his successor of the estate of Sarah J. Napier, deceased, after paying the expenses of the administration and the debts of the estate should turn the personal property, or the proceeds thereof remaining in his hands over to said plaintiff, Hattie May Haynes, and that the court costs of this proceeding should be paid out of the estate aforesaid.

"Wherefore, it is by the court considered, ordered, and adjudged and decreed that the said plaintiff, Hattie May Haynes, is entitled to all the property, both personal and real, of which the said testatrix, Sarah J. Napier, died possessed or seized, and that the defendants or either of them and none of them shall take anything by reason of this action except the sum of $630; that said plaintiff, Hattie May Haynes, is the owner of the following described real estate, to wit:

"Lot 3, block 131, and lot 3, block 130, and west 40 feet of lot 7, block 131, all in the original town site of the city of Pawhuska, Okla., situated in the county of Osage, state of Oklahoma

—and that the title to the same is hereby quieted in her forever.

"It is further ordered, adjudged, and decreed by the court that the property above described is impressed with a trust in favor of said plaintiff, and that the said executor and the beneficiaries under the terms of the last will and testament, that is, the devisees named in said will, shall be and are regarded as being trustees of the legal title to said land for the benefit of said plaintiff. * * *

"It is further considered, ordered, and adjudged by the court that the defendant, Charles M. Robinson, be and is hereby awarded judgment against the plaintiff for the sum of $630 in accordance with the findings contained herein, and that the same is hereby made a lien upon the property awarded to Hattie May Haynes until paid. * * *

"Jesse J. Worten, District Judge."

It has been repeatedly held by this court:

"The court will weigh the evidence in a case of purely equitable cognizance, but will not reverse the judgment unless it is against the clear weight of the evidence." Hines v. McCall, 132 Okla. 5, 269 Pac. 269.

The terms of the oral agreement as disclosed by the record are reasonably certain; the contract is supported by that clear, unequivocal, and decisive evidence which the law requires, and we are of the opinion the trial court correctly ruled in granting specific performance of said contract.

In Ruling Case Law, vol. 25, at p. 311, it is said:

"It is settled by a line of authorities which are practically uniform that while a court of chancery is without power to compel the execution of a will, and therefore the specific execution of an agreement to make a will cannot be enforced, yet, if the contract is sufficiently proved and the usual conditions relating to specific performance have been complied with, then equity will specifically enforce it after the promisor's death by seizing the property which is the subject-matter of the agreement, and fastening a trust on it in favor of the person to whom the decedent agreed to give it by will. There is no doubt therefore but that such an agreement is capable of enforcement after the promisor's death as against his estate and his personal representatives." Citing Brown v. Sutton, 129 U. S. 238, 32 L. Ed. 664.

The judgment of the trial court is in all matters affirmed.

MASON, C. J., and RILEY, HEFNER, ANDREWS, and SWINDALL, JJ., concur. LESTER, V. C. J., and HUNT, J., dissent. CLARK, J., absent.

---

LESTER, V. C. J. (dissenting.) I dissent for the reason that in my judgment the evidence, as shown by the record, does not reach that degree of certainty as required in order to sustain an oral contract to devise property prior to the death of the promisor.

---

HUNT, J. (dissenting.) I dissent from the order setting aside the opinion of Commissioner Hall and granting the rehearing in this case. The opinion heretofore adopted by the court thoroughly conforms to my views and, in my judgment, lays down the correct rule. I, therefore, most respectfully dissent from the opinion now submitted by Mr. Justice Cullison, and desire to file as my dissenting opinion herein the opinion of Commissioner Hall, without further comment:

HALL, C. This is an action to enforce specific performance of an alleged contract. To be more specific, it is a suit to fasten a trust upon all the real and personal property of two decedents, by virtue of an alleged oral contract to devise and bequeath it by will. The controversy is over the estates of John W. Napier and Sarah J. Napier, his wife. In 1923, John W. Napier died intestate, leaving surviving him his widow, Sarah J. Napier, as his sole heir at law. In 1926, Sarah J. Napier died leaving a will whereby she devised and bequeathed her property to persons other than the plaintiff. Plaintiff, who had formerly lived as one of the family for nearly five years in the home of the Napiers, then commenced this suit for specific performance of

an alleged contract or agreement which she says was made between her mother and John W. Napier and Sarah J. Napier, whereby the latter, the Napiers, agreed to devise to her by will the property in question, in consideration that she, the plaintiff, would go and live with the Napiers in the capacity of an adopted child. A more minute history of the controversy is as follows:

Viola McIntee, the mother of plaintiff, obtained a divorce from her husband in a district court of the Oklahoma Territory in 1905, upon the grounds of extreme cruelty. She had four children, their ages ranging from five to nine years. The custody of these children, one of which is the plaintiff in this action, was awarded to her. She later married a Dr. Burnett, a brother of Sarah J. Napier and a cousin of John W. Napier, whose estates are the subject-matter of this suit. At Christmas, in the year of 1907, one of these children, Hattie McIntee, the plaintiff in this action, went to live in the home of the Napiers at Iola, Kan. She took up her permanent abode with them. At that time she was 13 years of age. The Napiers later moved to Pawhuska in this state, where the husband, John W. Napier, engaged in the hardware business. In business he was a success. Plaintiff was treated by the Napiers, which is not unusual under such circumstances, like a member of their family. She was well cared for, and was given all the educational and social advantages which could be obtained in the communities in which they lived. The Napiers, especially John W. Napier, was very fond of her. When he was away from home, or when she was away, he would write her affectionate notes or letters, and address her as "Miss Hattie Napier," instead of "Miss Hattie McIntee." However, when she married, she did so under the name of Hattie McIntee. John W. Napier, as the foster father, gave his consent to the marriage and signed the necessary waiver, she being under the age of 18 years. Plaintiff lived in the Napier home, or with the Napiers, for nearly five years, until the year of 1912, at which time she married, and with her husband moved to Muskogee. She, however, was a constant or occasional visitor in the home of the Napiers thereafter, or until their death. At the time Hattie (the plaintiff) went to live with the Napiers. Mr. Napier was about 55 years of age, and his wife was about 50 years of age. John W. Napier died eleven years after plaintiff married and took up her home elsewhere, and Sarah J. Napier died 13 years after plaintiff married and ceased to live with them. John W. Napier died intestate,

and in the administration of his estate plaintiff did not claim any right to the property of this decedent on the theory that she was an heir at law by adoption. In fact, it is not the theory of plaintiff that she has any rights as an heir at law, by virtue of any parol agreement to adopt; that is, by any agreement to take her into the family and treat her as if she were a natural child; but rests her case wholly and solely upon the proposition that she is entitled to all the estate of both John W. Napier and Sarah J. Napier upon the grounds that they promised to make her their sole beneficiary under their wills, and having failed to so do, she seeks specific performance, or what in equity amounts to specific performance of the agreement.

Sometime prior to the death of Sarah J. Napier, she executed a will devising and bequeathing to certain persons all her property, apparently by reason of their loyalty and fidelity, and the assistance given her and her husband during the last years of their life. As throwing some light on the controversy, the will of Sarah J. Napier contains the following provisions:

"Third: I give and devise to Lola M. Grant (certain real property, describing it, which property is situated in Osage county) in fee forever.

"Fourth: On account of my friendship and respect for Charles M. Robinson, of Pawhuska, Okla., who was always kind to John W. Napier, my deceased husband, and who has ever been kind to me and considerate of my personal and financial welfare, I hereby give, devise, and bequeath to him, as a matter of appreciation (certain real and personal property).

"Fifth: After the disposition of my property as hereinbefore set forth, I give and devise to Maude Grant (certain real and personal property) said property to be used, controlled, and disposed of by her when necessary for the support and maintenance of herself and the education of Opal Marie, John William, and Charles, Jr., Grant, her said children. This provision is made for said Maude Grant and her said children because of our long intimate and pleasant association with her husband, Charles Grant, who we have raised from the time he was a boy five years of age."

This will was entered to probate, and distribution thereunder was made to the beneficiaries.

The Napiers had no children of their own. Their only child, it seems, died before it grew to manhood or womanhood.

The foregoing statement constitutes the undisputed facts of this controversy.

The contract or agreement by which plaintiff seeks to charge the estates of J. W. and Sarah J. Napier, was attempted to be established by the testimony of Mrs. McIntee Burnett, the mother of plaintiff, and by Dr. Burnett, the stepfather of plaintiff. In substance, they testified that, in 1907, while the Burnett-McIntee family were living in Clinton, Okla. Terr., John W. and Sarah J. Napier made an extended visit in their home, and while there they became somewhat infatuated with plaintiff and her sister. According to this testimony Mrs. Napier expressed her emotions in tears and wanted to take one of the girls home as "their own little girl, treat her as her own daughter, and give her everything they had at their death, as they had no one to leave their property to." Hattie (plaintiff) was selected as the one to go. Her mother testified that she would not have given her consent to plaintiff leaving home and taking up her permanent abode with the Napiers had it not been for the promise to make her the sole beneficiary of their estates at their death. Plaintiff testified essentially to the same things, but, as she was an incompetent witness under the statute, section 588, Comp. Stat. 1921, and under the general rules of evidence, her testimony cannot be considered. The husband of plaintiff's sister, a Mr. Lemp, testified that while he and his wife were visiting the Napiers, John W. Napier stated that he intended to give Hattie (the plaintiff) all of his estate at his death. This, however, was random conversation, and is of but little, if any, value tending to establish a contract of this nature.

The defendants introduced several witnesses having intimate knowledge of the affairs of the Napiers, who testified that they never heard of any arrangement whereby the plaintiff was to be given all or any portion of the property of the Napiers; that the Napiers never, directly or indirectly, so far as they knew, made any statement or remark tending to leave such impression.

After a lengthy hearing upon the merits, the trial court rendered judgment in favor of plaintiff, decreeing title in her to all the property of which John W. Napier and Sarah J. Napier died seized, save and except that portion which was necessary for payment of their debts, and that part of the estate of John W. Napier which was necessarily spent by his widow after his death.

The cause is brought here to this court for review upon numerous assignments of error. On account of the views which we have reached, after a careful consideration of this

case, it is only necessary to discuss one question, namely, whether the contract was established by sufficient satisfactory proof; that is, established to that degree of moral certainty to warrant a court in enforcing a parol agreement to devise property, and be enforced after the death of the person whose estate is sought to be bound.

It is definitely settled that it is competent for a person to make a binding oral agreement to dispose of his property by last will and testament. The fundamental weakness in a proceeding to enforce such an agreement lies in the fact that it is on or near the borderland which offends the policies of the law. Such agreements, though sometimes enforced, must be established by the clearest and most satisfactory evidence. In addition to the required quantum and quality of testimony, the agreement will never be enforced unless it is (1) clear, (2) definite and certain, (3) equitable and just, (4) mutual in its obligations, and (5) after a strict performance by the promisee of all its terms. As our decision rests upon the insufficiency of the testimony, these last five elements will be passed.

Specific performance of a contract falls solely under the jurisdiction of equity. There is a class of contracts, where the contract is in writing, is certain in its terms, and executed for a valuable consideration, is fair and just in all its provisions and capable of being enforced without hardship to either party, in which it becomes the duty of a court of equity to decree specific performance, just as it becomes the duty of a court of law to award damages for breach of contract; but in the class of contracts under which the one in the present case falls, the right of performance is not absolute, but rests entirely in the sound judicial discretion of the courts. Perhaps the clearest statement extant on the subject and applicable to a state of facts very simi'ar to the facts in the present case, is found in the body of the opinion in the recent case of Pancoast, Adm'r, v. Eldridge, 134 Okla. 247, 273 Pac. 255, in which it is said:

"Mr. Story, in his Equity Jurisprudence, section 1016A, says: 'The enforcement of contracts of the character here involved is an exception which courts of equity have ingrafted upon the statute of frauds. The exception is one that is sparingly exercised, and rightfully so. The very conscience of the court must be touched by the facts of the particular case before the exception to the statute will be called into play.' "

The opinion in the above case by Justice Hefner settles this controversy in favor of the plaintiff in error in this action. In this connection, it must be understood that plaintiff's contract was established solely by interested witnesses, her mother, her step-father, and her brother-in-law, her sister's husband. No disinterested witness furnished any testimony favorable to the plaintiff in this action. However, in cases of this nature, even though disinterested witnesses testify on behalf of persons seeking specific performance, yet the question is one to be exercised within the discretion of the court, primarily the trial court, and this court on appeal. Because a certain number of witnesses, interested or disinterested, have testified regarding an oral contract to devise the whole or part of an estate, especially after the promisor's death, does not entitle the plaintiff, as a matter of right, to a decree of specific performance. The universal rule is stated in the first paragraph of the Pancoast Case, as follows:

"Before a court of equity will specifically enforce an oral contract to devise property, the proof of the contract must be so cogent, clear, and forcible as to leave no reasonable doubt as to its terms and character."

On the point, the court, in its brief and comprehensive opinion in that case, said:

"The rule as to the weight to be given evidence in such cases is well stated in 36 Cyc. 692, wherein it is said: 'The rules as to the weight of evidence are applied with the utmost strictness to oral contracts to devise the whole or part of an estate. Such contracts are viewed with suspicion by the courts, and must be established by the clearest and most convincing evidence. In these, as in other contracts, one party to which is deceased, the defendant heirs or devisees are under the disadvantage that they are deprived by his death of their most important testimony. In such contracts, the proof, in addition to inferences from the situation, circumstances, and relations of the parties, must generally consist of evidence of verbal declarations made by the deceased to third persons. This is a kind of evidence which the law recognizes as weak and unsatisfactory, and to be scrutinized with care.' Again, in the case of Asbury v. Hicklin, 181 Mo. 658, 81 S. W. 390, this language appears: 'A court of equity in this state will specifically enforce an oral contract to make a will in a particu'ar manner, where a valuable consideration has been received for the promise, and a fraud would be perpetrated upon the promisee or beneficiary unless the contract be performed. But the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character.' "

Among the correspondence of John W.

Napier and Sarah J. Napier to plaintiff and plaintiff's mother, we submit to the reader the following excerpts:

(Letter from John W. Napier to plaintiff): "* * *fur your old oncle has the dow and is making more, and if you conduct your self rite, as I want you too, you can have more some day."

(Letter from Sarah J. Napier to mother of plaintiff): "I can tell you, and sow can Hattie, that wee get along just fine, and she dont have to wonder where she will get her next dress. Nor she wont as long as J. W. lives, and I think I will have something fur the kid left if she mines J. W."

(Excerpt from letter of J. W. Napier to plaintiff): "* * * when you air 35 years old, then hit will bee plenty of time too let some sun of a GGG abuse you, fur if he ever abused you while I live he would go to — (perdition) with his boots on: * * *"

These letters indicate that the intention to devise the property, or a portion of it, was only conditional.

The last letter, in addition to the rather extravagant statements, seems to leave the impression that the promisor, John W. Napier, expected the plaintiff to live with them for 17 years longer than she actually did. This particular fact, together with the absence of any positive evidence of the length of time which plaintiff was to make her home with the Napiers, raises the question of the definite and certain character of the alleged contract; but, as previously stated, our decision is in no wise based upon that principle, and therefore no discussion will be devoted to it.

We do not assume that the plaintiff's witnesses testified falsely pertaining to any essential matter or any matter involved in this controversy. We do not know. What we do say is that public policy and the very proprieties of the law preclude p'aintiff from a recovery in this action upon the testimony introduced. To perm't plaintiff to prevail in this case would render insecure and highly uncertain the ownership of every valuable estate of a decedent. It would establish a precedent whereby a group of interested persons could testify to a parol agreement made with a person whose lips are frozen in death, and thereby establish a prima facie case, and use courts of equity themselves to assist in perpetrating a monstrous fraud. Such is not the law, and it never will be. It would be productive of much grave evil without any corresponding good. On this point, the highest court of the state of New York, in the case of Hamlin v. Stevens, 69 N. E. 118, made such a clear and sane discussion of the matter that it is worthy of reproduction in this opinion. In that case it was said:

"Contracts of the character in question have become so frequent in recent years as to cause alarm, and the courts have grown conservative as to the nature of the evidence required to establish them and in enforcing them when established, by specific performance. Such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises. They are the natural resort of unscrupulous persons who wish to despoil the estates of decedents. In Shakespear v. Markham, 72 N. Y. 400-403, this court declared that: 'Contracts claimed to have been entered into with aged or infirm persons to be enforced after death to the detriment and disinheriting of lawful heirs, who otherwise would be entitled to their estates, are properly regarded with grave suspicion by courts of justice and should be closely scrutinized and only allowed to stand when established by the strongest evidence. * * *' We are of the opinion that no view of the evidence in the case before us would warrant the conclusion that the alleged contract was made. Assuming that the trial judge believed that the appellant and his mother intended to tell the truth, still owing to their deep interest, it would be unsafe to base a finding on their testimony when it may be followed by such grave consequences. Such contracts are dangerous. They threaten the security of estates and throw doubt upon the power of a man to do what he wills with his own. The savings of a lifetime may be taken away from his heirs by the testimony of witnesses who speak under the strongest bias and the greatest temptation with all the dangers which, as experience shows, surround such evidence. The truth may be in them, but it is against sound policy to accept their statements as true under the circumstances and with the results pointed out. Such contracts should be in writing and the writing should be produced; or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses. Unless they are established clearly by satisfactory proofs and are equitable, specific performance should not be decreed. We wish to be emphatic upon the subject, for we are impressed with the danger and aim to protect the community from the spoliation of dead men's estates by proof of such contracts through parol evidence given by interested witnesses. * * *"

Another case directly in point is Wall v. McEnnery's Estate, 105 Wash. 445, 178 Pac. 631. That case quotes at length from the New York case of Hamlin v. Stevens, supra. Another leading case is Holmes v. Connable, 111 Iowa, 298, 82 N. W. 780. Other cases

in point are Pantel v. Bower, 104 Kan. 18, 178 Pac. 241; Matthews v. Tobias, 126 Ore. 358, 268 Pac. 988; Popejoy v. Boynton, 112 Ore. 646, 229 Pac. 370.

Plaintiffs in error also urge with considerable force that it would be inequitable to impress the property of Sarah J. Napier with a trust in favor of plaintiff as against the beneficiaries under her will, which beneficiaries looked after and cared for these old people in the evening and twilight of life, but we do not deem it necessary to pass upon this question. It, however, is an accepted rule that, before specific performance will be awarded in cases of this nature, such transactions must not be inequitable; that is, they must, in every particular, be fair and just. The sooner that parties who seek to enforce contracts of this nature reduce their agreements to writing, and then draft them in a definite form, the sooner the courts will be warranted in enforcing them. Until this is done, the very safety of property rights and the sacredness with which the law must be administered in regard to dead men's estates demand that the courts pursue the straight and well-beaten paths, and enforce such agreements only when every essential element is present, one of which is that the proof must be conclusive.

Upon the grounds herein discussed, the judgment of the trial court is hereby reversed, with directions to render judgment for defendants.

LEACH, REID, HERR, and FOSTER, Commissioners, concur. DIFFENDAFFER, Commissioner, dissents.

Note.—See under (2) 25 R. C. L. p. 310; 25 R. C. L. p. 311.