YORK  v.  YORK et al.

No. 35886.

Supreme Court of Oklahoma.

Nov. 10, 1953.

Rehearing Denied March 30, 1954.

Application for Leave to File Second Petition for Rehearing Denied May 25, 1954.

Murray F. Gibbons, Purcell, for plaintiff in error.

Louis W. Beck, Purcell, for defendants in error.

BLACKBIRD, Justice.

Plaintiff in error, hereinafter referred to as plaintiff, is one of the nephews of W. Lee York, who died intestate and a bachelor, on January 5, 1952, while a resident of McClain County, seized and possessed of a 40 acre farm in said County. Sometime after another of the decedent's nephews, Tom York, had been appointed administrator of said decedent's estate, plaintiff commenced this action against said administrator and the decedent's other nephews and nieces and statutory heirs, as defendants, to compel specific performance of an oral contract he allegedly had with the deceased to devise him the farm, and to quiet his alleged title thereto by reason thereof, against said defendants. According to plaintiff's petition he had, prior to his marriage, resided on the farm with the deceased who had a hernia, by reason of which he was physically unable to properly cultivate the farm and care for himself.

The oral contract was allegedly entered into between plaintiff and his uncle when, in 1932, plaintiff decided to marry and establish a home of his own, and upon his communication of such information to his said uncle, the latter proposed that after his marriage, plaintiff and his wife reside with him, and plaintiff continue to cultivate and manage the farm, and in addition, with the help of his wife, keep house, cook, wash and do other things necessary to the care, comfort and well-being of the said Lee York, in consideration for which York "would take the necessary steps and make the necessary arrangements to insure that * * * plaintiff would become the sole owner of the farm upon York's death." Plaintiff further alleged that during the years remaining in his uncle's life, after said oral agreement was entered into, he and his wife fully carried out their part of said agreement, including the making of improvements on the farm, but that since his uncle's death they had been unable to discover any evidence that he had ever made a will.

Defendants answered plaintiff's petition with a general denial and a special plea that if any such oral agreement had been entered into as alleged in plaintiff's petition, it was invalid under the Statute of Frauds,

because no note or memorandum of it, in writing, was ever made or was ever subscribed to by Lee York.

At the trial of the cause to the court, without a jury, because of a serious impediment in plaintiff's speech preventing him from testifying articulately, it was stipulated that if able to testify, he would relate among others, the following facts: That prior to his marriage in 1932, he "spent considerable time in Lee York's home, that subsequent to his marriage plaintiff and his wife made their home on the York farm until about September, 1942; that in the latter month, plaintiff and his family, accompanied by York, moved from that farm to the farm of plaintiff's wife's father, Mr. Hofstetler, (after the latter's wife's death), and they all continued to reside there until January, 1945, when they moved to the Fry farm, where they continued to reside until about September, 1947, when plaintiff and his family and York moved back to York's farm, where they resided until the latter's death in January, 1952; that during said entire period of time, from 1932 on, with the exception of two years", plaintiff farmed the York place, "looked out for its upkeep and maintenance and paid to * * * Lee York, the customary farm rent in crop shares"; that plaintiff, at his own expense, set out fruit trees and shrubbery and maintained fences and made other necessary repairs to the buildings on the farm at his own expense.

Plaintiff's only other witnesses were his nineteen-year-old married daughter, Mrs. Helen Myers, his fifteen-year-old daughter, Gay, his wife's half-brother and half-sister, Buster Porter and Mrs. Irene Riley, and one of the deceased's nephews, Frank York. Four other nephews, the administrator Tom York, W. C. Mankins, and Olen Roberts, and plaintiff's brother, Henry York, testified for the defendants.

At the close of the evidence, the trial judge took the cause under advisement, and thereafter, in accord with plaintiff's previous request, promulgated and filed certain findings of fact and conclusions of law, in accord with which he later rendered judgment for the defendants.

In his present appeal from said judgment, the only decisive one of the trial court's findings plaintiff challenges is the 7th one, wherein said court found the evidence insufficient to establish the contract upon which the action was based, and thereupon concluded that the specific performance plaintiff sought was not warranted.

The digest of the authorities pertaining to the granting of specific performance of "decedent's agreement to devise, bequeath, or leave property as compensation for services" contained in the exhaustive annotations at 69 A.L.R. 14, and 106 A.L.R. 742, reveals that such relief has, in the majority of jurisdictions, been granted where the contract sued upon has been sufficiently proved and the conditions precedent for the granting of this form of equitable remedy are present. 106 A.L.R. 747. However, it is the almost universal rule, as held in Robinson v. Haynes, 147 Okl. 95, 294 P. 803, 806, that:

"Before a court of equity will specifically enforce an oral contract to devise property, the proof of the contract must be so cogent, clear and forcible as to leave *no reasonable doubt* as to its terms and character." (Emphasis ours.)

In accord, see Kinnett v. Goodno, 170 Okl. 620, 41 P.2d 824, and Paull v. Earlywine, 195 Okl. 486, 159 P.2d 556. The majority of courts that have expressed themselves on the subject are agreed that such an action, being an effort by a contract resting in parol, to distribute the estate of a deceased person in a different way from that provided by law, should be looked upon skeptically and the evidence to establish it "weighed in the most scrupulous manner." 106 A.L.R. 748, and authorities there cited. Thus, it is said that he who claims under such an alleged oral agreement must show a clear and mutual understanding and a positive agreement of both parties to the terms of the contract, and if the language employed by the parties leaves their intention in doubt, or if there is uncertainty in regard to what was intended, a court of equity will not undertake to decree specific performance. In commenting upon the character of proof required in such cases,

the court, in Selle v. Selle, 337 Mo. 1234, 88 S.W.2d 877, 881, demonstrated that such a contract cannot be established by testimony as to conversations either "too ancient" on the one hand or "too loose or casual" on the other; that proof of the contract must be such as to leave no reasonable doubt in the mind of the chancellor that the contract claimed was in fact made. It must be recognized, however, that what is necessary to attain such a high degree of definiteness and certainty must depend to some extent upon the subject matter of the contract, the purpose for which it was entered into, the situation in relation to the parties, and the circumstances under which it was made. In all such agreements involving realty, where there is no note or memorandum of the agreement in writing, performance by the parties seeking its specific performance will take the agreement out of the Statute of Frauds, 15 O.S.1951 § 136, but such performance must be *clearly referable* to the contract and must consist of services whose character is exceptional and extraordinary and whose value cannot be fairly estimated by any pecuniary standard, or it must appear that the promisee's "whole course of life was changed" by his performance, 106 A.L.R. 756–761, both inclusive. The relaxing of the rule established by the Statute of Frauds, by holding that a part performance removes the bar of the statute, is based upon the ground that it is a fraud for the promisee to insist on the absence of a written instrument when he has permitted the contract to be partly executed. If the promisee, with the knowledge and consent (either tacit or express) of the promisor, does acts pursuant to and in obvious reliance upon a verbal agreement which has so changed the position of the parties as to render a restoration of their former condition impracticable, it is a virtual fraud on the part of the promisor's heirs or estate to set up the Statute of Frauds as a defense and thus rob the promisee of the benefits of the contract after he has performed thereunder, and his chance for receiving any reward or pay for his services in a suit at law, may be more or less remote or even non-existent. 69 A.L.R. 121, 122, 124, and authorities cited under Notes 73 and 77.

The acts of the parties and the equities arising therefrom are the real basis of equitable relief and for their acts to be "referable" to their contract, they must point clearly and exclusively to the existence of that particular contract or one of the same general tenor. See Annotations, supra, and 69 A.L.R. 125, 129, Notes 78 and 79. Thus, conduct which can be reasonably explained without reference to such an oral contract does not usually constitute the "performance" required. "What is done must itself supply the key to what is promised." 69 A.L.R. 128. Thus, in Burns v. McCormick, 233 N.Y. 230, 135 N.E. 273, 274, it was said:

> "Inadequacy of legal remedies, without more, does not dispense with the requirements that acts, and not words, shall supply the framework of the promise. * * * (That requirement) is 'intended to prevent a recurrence of the mischief' which the statute would suppress. * * * The peril of perjury and error is latent in the spoken promise. Such, at least, is the warning of the statute * * *. Equity, in assuming what is in substance a dispensing power, does not treat the statute as irrelevant, nor ignore the warning altogether. It declines to act on words, though the legal remedy is imperfect, unless the words are confirmed and illuminated by deeds."

This Court in Pancoast, Adm'r v. Eldridge, 134 Okl. 247, 273 P. 255, referring to the use of testimony in cases like the present, explained one good reason why oral contracts to devise property are viewed with suspicion, and the clearest and most convincing evidence is required in such cases. In accord with the weight of authority, we think it altogether fitting and proper that when an oral agreement to devise property is sued upon and the promisee relies on his performance of personal services to render the Statute of Frauds inapplicable, it should appear with reasonable certainty that the services would not have been performed but for the oral agreement.

This brings us to the task of weighing the evidence in the present case to see if the trial court's finding and conclusion in question is sustainable on the basis of the above principles. If so, his judgment must stand even though there might be good and sufficient ground for adopting a different view. See Stow v. Bruce, 178 Okl. 127, 61 P.2d 1043.

At the outset, we note that plaintiff made no effort to prove the allegations of his petition to the effect that the alleged oral contract between him and his Uncle Lee was entered into before plaintiff married. The stipulation as to what plaintiff would have testified to contains no reference to the contract or the occasion on which it was allegedly entered into, but plaintiff's daughters, both of whom were very young at that time, corroborated in a general way by Buster Porter and Frank York, testified to what transpired one morning in 1947, after plaintiff's marriage was several years old and the family had made its second move since living on the York farm, and was then living on the Fry farm. On that occasion, according to these witnesses, Lee York, about breakfast time, proposed that the family move back to his farm and "take care of him", in consideration for which the farm would be plaintiff's at his death. There is no question but that the family soon made such a move, but the evidence is also undisputed that after relocating on the uncle's farm, plaintiff paid him the regular crop rent of a tenant and there is serious question, on the basis of the evidence, as to whether the relationship between plaintiff and his uncle was otherwise any different from what it had previously been. Of course, it was shown that Mr. York ate some of his meals with the family, but it also appears that he had also done that even while they were living on the Fry farm, which was near his farm. It also appears that York had often slept at plaintiff's house on the Fry farm and it was indicated that he roomed and boarded with plaintiff's family continuously for the first six months after they moved back to his farm, but thereafter had a small house built there for himself, making it unnecessary thereafter for them to all live in the same dwelling. It is further indicated that he thereafter continued to take most of his meals with plaintiff's family,

but that he also purchased groceries. Also, it was not established that Mr. York was so incapacitated by his hernia that he could not manage the farm and look after his own personal needs. On the other hand it was unequivocally established only that he was not able to do the heavier work on the farm. In the matter of paying taxes and bills and looking after other business matters entailing no heavy manual labor, it appears that he was probably more capable than plaintiff, and that plaintiff was little more than a combination tenant, confidant, errand boy and/or chauffeur of his uncle. Undoubtedly each did favors for the other that were reciprocated, not because of any feeling of contractual obligation, but from motives of mutual love, affection and helpfulness. Typical of the evidence as a whole and the varying inferences to be drawn therefrom is the testimony concerning the doing of the intestate's laundry. Some of the testimony represented that it was all done by plaintiff's wife, but other testimony indicated that, at least part of the time, it was done in a commercial or help-yourself laundry and paid for by the intestate. Nor is the testimony concerning the making of improvements on the York farm such that it can be said to have any decisive significance or be different from what is sometimes done by ambitious and energetic tenants. Looking at the personal services furnished his uncle by the plaintiff and his wife, against the background of their previous and continued relationship and association, it is difficult if not impossible to find anything the latter did for the uncle after he made the promise attributed to him that they would not have done otherwise, and had it not been for such a promise. The facts concerning this relationship strongly induce the belief, often referred to as a "presumption" in the case of close relatives, that such services were furnished gratuitously and more because of mutual love, affection, esteem, high regard, gratitude, and/or *hope* of some future but undetermined reward, than in performance of the claimed contract. In this connection see 69 A.L.R. 132 and, as to that subject, generally, see the Annotation on the Recovery For Services To Relative appearing in the Annotation beginning at 7 A.L.R.2d 8. Without further lengthening this opinion to detail the evidence, we need only say that we have examined it thoroughly and upon consideration of it as a whole, together with the inferences to be reasonably drawn therefrom, it is such that the trial court's finding and conclusion cannot be held to be contrary to it or to the law as applicable thereto.

Accordingly we conclude and hold that the trial court's judgment denying plaintiff specific performance of the alleged "contract" was not error; and the same is hereby affirmed.

HALLEY, C. J., JOHNSON, V. C. J., and CORN and DAVISON, JJ., concur.

WELCH, O'NEAL, and WILLIAMS, JJ., dissent.

WILLIAMS, Justice (dissenting).

Admittedly, the trial judge was in a better position than is this court to correctly react to the testimony of the witnesses, in case of a conflict. However, as I view the evidence in this case, there appears to be therein only slight, if any, direct contravention.

Plaintiff alleged an oral contract to leave the farm in question to him, to have been made in 1932. The opinion of the majority attacks plaintiff's failure to secure a stipulation that the contract was made in that year. Such deficiency of proof is quite easily explained. Plaintiff has such a serious impediment of speech as to require that his testimony be taken by stipulation. Defendants, naturally, could not be expected to stipulate to facts which they might only suspect, or be told, but not know, to be true.

The majority also attacks plaintiff's case for want of showing with definiteness the existence of the alleged oral contract, the time and place and circumstances of its inception etc.

It is not contradicted that deceased was an "old bachelor" with whom plaintiff had lived a great part of the time over a long period, prior to the latter's marriage. Plaintiff informed "Uncle Lee" he was going to be married and, after he had married, brought his bride to Lee York's place

in about 1932, and lived there, Lee York living with the couple as a member of their family.

Later, in about 1942, the family moved some half mile or more away to the farm of plaintiff's parents-in-law, Lee York moving with them and continuing as a member of the family. After living there some two and a fraction years, the family again moved to another farm about half a mile away where they lived. Lee York residing with them, until about the spring of 1947.

During all of the years since 1932, except two, plaintiff had continued to farm the Lee York land as a share-crop rent-paying tenant. During all of these years, Lee York had slept in one of plaintiff's beds, eaten at his board, had his clothes washed and ironed by plaintiff's wife and enjoyed the companionship in his declining years of plaintiff, "the nearest thing he had to a son," and plaintiff's wife and three children. However, "Uncle Lee" did return to his own house about once a week to stay overnight in order to maintain his right to "homestead tax-emption".

As to transactions personally had between plaintiff and deceased, the trial court properly found plaintiff to be an incompetent witness. Plaintiff's wife also was determined to be an incompetent witness and properly so. Plaintiff, apparently failing in his efforts to prove an agreement to have been made and performance begun thereunder in 1932, then sought to prove that in 1947 an agreement *had theretofore been made.*

Buster Porter, half-brother of plaintiff's wife, was staying with the plaintiff's family on the occasion when the incident hereinafter related occurred. At that time he was farming some land adjoining the farm where plaintiff's family lived, on the west. Frank York, plaintiff's brother, who was keeping some milch cows at plaintiff's place, came over that morning to milk. "Uncle Lee" went outside the house and met Frank York and Buster Porter and told them, "Buster, I want you and Frank to witness an agreement I made with Willie, and Maudie."

Lee York, inside the house and in plaintiff's living room, and in the presence of the plaintiff, his wife, his little son, Frank York, Buster Porter and plaintiff's two daughters, then said, "I told them if they would move back on my place and stay with me the rest of my days, it was theirs when I was through." This conversation was testified to positively and unequivocally by the last four persons named. The testimony of Frank York was against his own interest as he is an heir at law of the deceased. When asked, upon cross-examination, whether he was not testifying against his own interest, he answered, "According to the agreement I didn't figure I had any."

Several other facts appear in the record, without substantial evidence to the contrary. Lee York suffered for years from double hernia and had high blood pressure. He could not work his farmlands; he would go out and cut broom-corn for perhaps half a day and have to quit; he picked no cotton to speak of and he could not do any lifting.

Defendants' testimony was primarily that "Uncle Lee" had a few pounds of laundry done each six weeks or so for which he himself paid; that he had run up a little grocery account at a neighborhood store in the amount of some $30; that "Uncle Lee" paid a repair bill on his automobile which plaintiff's evidence had tended to show "Uncle Lee" gave plaintiff because deceased could not pay the upkeep; and that some of the defendants, nephews of deceased, along with plaintiff, signed a note for the amount of deceased's burial expenses.

Defendants also showed that the deceased had paid the expense of building a one-room 10 foot by 12 foot dwelling for himself back of his house in which plaintiff lived and tended to show that deceased had also paid for some fiber board placed by plaintiff in the main dwelling-house. Defendants raised the further point that deceased had received some $3000 during his lifetime from the sale of an oil and gas lease and raised a question as to what had become of the money. Defendants also made point of the fact that plaintiff paid rent all the while.

The stipulation, hereinbefore referred to, contained the statement that plaintiff, at his own expense, planted fruit trees and made improvements to the dwelling-house. His proof was that his wife raised the question when Lee York wanted them to move back that the three-room house was small for all of them to try to live in and that Mr. York built the separate house for his own convenience. It further tended to show that "Uncle Lee" loved sweets and that possibly his grocery bill was for cookies, etc., that he desired in addition to the meals regularly served to plaintiff's family. Plaintiff's further evidence was that "Uncle Lee", after discovery by the welfare department that he had received money for the oil lease, had to return to such department certain old age assistance benefits in undisclosed and apparently unknown amounts which he had received; that "Uncle Lee" gave plaintiff the automobile in question; that plaintiff hauled him around in it; that plaintiff paid all or most of the upkeep on the car. Plaintiff's proof was to the further effect that he paid the taxes on the lands in question; that Lee York had paid the 1932 taxes on the farm but that plaintiff paid the taxes for 1931, same having become delinquent and further paid the 1933 taxes and for all years since on said land, usually by check, sometimes by cash.

Plaintiff's explanation of his having paid rent to deceased through all the years was that the oral contract provided, not that plaintiff should have the use of the farm during deceased's lifetime rent-free, but that plaintiff and his wife, if they complied with the agreement, should have deceased's farm "when he was through with it."

The majority opinion indicates that plaintiff's performance should be referable to the contract; that the evidence should be so strong as to leave no reasonable doubt in the mind of the chancellor that the oral contract to make a will was actually made; and that the circumstances requiring the court to specifically enforce such an alleged contract must be such as to make the failure so to do practically amount to the perpetration of a fraud upon the plaintiff, himself.

It occurs to me that the acts of plaintiff and his family could be referable to nothing but the contract alleged. The majority speaks of plaintiff's conduct after 1947 amounting to no particular departure from his former manner of taking care of his uncle. One witness said the plaintiff was Lee York's "pick" of all his nephews. It seems to me that deceased, speaking through the witness, should certainly be heard today to say that he would like for his "pick" of his nephews, the one who changed the course of his own life and lived with deceased and took care of him through the last eighteen or twenty declining years of his life, and his wife, to be, if not rewarded, at least, in accord with the principles of justice, equity and fair-play, compensated in accordance with the terms of the contract, which was knowingly entered into, and solemnly and orally acknowledged in the presence of numerous witnesses and not substantially disputed by defendants.

As plaintiff has definitely earned the lands in question, and deceased is apparently "through with them", I sincerely believe they should be awarded to the former. I, therefore, respectfully dissent.