STATE of Oklahoma ex rel. Larry DERRY-
BERRY, Attorney General of
Oklahoma, Appellee,

v.

ST. ELIJAH'S ANTIOCHIAN ORTHODOX
CHRISTIAN CHURCH, Appellant.

No. 46731.

Supreme Court of Oklahoma.

June 1, 1976.

Larry Derryberry, Atty. Gen., Donald B. Nevard, Asst. Atty. Gen., and Ross Lillard III, Legal Intern, for appellee.

Lloyd G. Copenbarger, Norman, for appellant.

DAVISON, Justice.

Dora C. Nahelka, hereinafter called decedent, died intestate and without heirs on January 5, 1972. The decedent was a resident of Oklahoma County and unknown to her neighbors and others, she left a sizeable estate, consisting of both real and personal property.

Two friends and neighbors of the decedent, Dr. Allan J. Stanley and Mrs. Mamie M. Webster, were appointed coadministrators of this estate in the District Court of Oklahoma County.

Thereafter, on May 24, 1972, the appellee, State of Oklahoma, ex rel. Larry Derryberry, Attorney General, filed this action in the District Court of Oklahoma County to escheat the entire estate of decedent to the State of Oklahoma, under the provisions of 84 O.S.1971 § 271 et seq.

The defendants named in this escheat action were the following: The above named coadministrators of the estate; Ann Michelson and Dan Nachel, being a niece and nephew of the decedent's predeceased husband; the appellant herein, St. Elijah's Antiochian Orthodox Christian Church; and the priest of said church, Father Elias Karim.

The coadministrators of the estate answered admitting the allegations of the State's petition and alleging the only person or entity having an interest in this estate was the State of Oklahoma.

Ann Michelson and Dan Nachel filed an answer alleging that they are the son and daughter of John Nahelka, a deceased brother of Carl S. Nahelka, the predeceased husband of the decedent. The answer further alleges that the decedent died intestate, but that all of her estate was acquired during the marriage to Carl S. Nahelka and by their joint industry; that decedent did not remarry; and therefore, under the terms of 84 O.S.1971 § 213, all or substantially all of the said estate should be given to them.

Ann Michelson and Dan Nachel replied to the coadministrator's answer denying that they are not heirs of the decedent. This reply also alleges that the bulk of the estate was not inherited by the decedent from a brother, Frank Tumchok, but rather was acquired by the joint industry of the decedent and her husband, Carl S. Nahelka. This issue is not involved in this appeal.

St. Elijah's Antiochian Orthodox Christian Church and Father Elias Karim first answered on September 15, 1972, denying that the decedent died intestate and alleging the said Church and Priest claim the estate under a will. On February 28, 1973, they filed an amended answer and cross-petition. They state they had insufficient information to admit or deny that the decedent died intestate. In the cross-petition, they alleged that the Church, by its agent Father Karim, entered into an agreement with the decedent on January 16, 1971, by which the decedent was to leave all her property upon her death to the Church if the Church would provide her a provo-slavani funeral similar to those conducted for certain of her friends. It alleged that Father Karim did agree on behalf of the Church to provide her a provo-slavani funeral, that the agreement was confirmed on March 3, 1971, and again on September 8, 1971, and that on January 7, 1972, the decedent was given such a funeral by the Church. This cross-petition alleges that the decedent breached said agreement by failure to make a will and that the church is entitled to specific performance and an order giving it the entire estate.

After a lengthy trial, the court ordered that the property in the estate be escheated to the State of Oklahoma except for $14,000.00 which was given to Ann Michelson and Dan Nachel. That part of the transcript dealing with the dispute as to what jointly acquired property was involved is not in the record in this Court, and neither the State or the said heirs of the predeceased husband of the decedent appealed from that part of the judgment.

The appeal before us involves only the action of the trial court in denying the claim of the appellant church. Since the church claimed all of the estate, we note in the petition in error that the State, Ann Michelson and Dan Nachel are all made appellees. Ann Michelson and Dan Nachel did not file briefs herein, however, in view of the disposition we make of the church's appeal, no inquiry on this matter need be made.

The journal entry of judgment does not make findings of fact or conclusions of law, but such were not asked for. We would note however, that from the court's remarks in the record, that the basis of the judgment against the claim of the church was that the alleged contract being oral was not enforceable because of the Statute of Frauds.

Before dealing with the alleged errors, some brief review of the evidence must be made since the evidence deals heavily with the type of funeral given for this decedent. The decedent was elderly at the time of her death having immigrated to the United States from the Russian Ukraine somewhere between 1905 and 1910. At that time, she was about thirteen years of age and was married at an early age, either in Russia or the United States to Carl S. Nahelka, also a Russian immigrant, who remained her husband until his death in 1941. The husband was a cobbler by trade. They moved to Oklahoma City from Minnesota in 1930 and continued to live in Oklahoma City until their deaths.

Both the decedent and her husband were of the Russian orthodox christian faith. The evidence details the different branches of the orthodox christian church.

Father Karim is the Arch Priest of St. Elijah's Antiochian Orthodox Church in Oklahoma City. He has been with that church for some nine years. In the old days, the Antiochian Orthodox Church was known as the Syrian Orthodox Church as distinguished from the Greek Orthodox Church or the Russian Orthodox Church. The ethnic groups primarily represented in St. Elijah's now are Americans of Lebanese and Slavanic descent. The English language is used, although on special occasions Arabic, Greek and Slavanic are used.

The decedent had attended at times St. Mary's, a Ukranian Orthodox Church in Jones, Oklahoma, and Corpus Christi Roman Catholic Church in Oklahoma City. The latter church was close to her home.

Father Karim first learned of the decedent in 1969 and visited her home a number of times. The church secretary of St. Elijah's, during the period from August, 1970 to February, 1973, testified that the decedent was on the file of membership of that church. She became a member sometime after 1969. She attended church very seldom and Father Karim could not recall her ever having contributed to the church. Father Karim testified she attended church "spasmodically" and he could remember only one occasion when she attended other than funerals. She had attended provoslavani funerals at St. Elijah's and this was the type of funeral she wanted. This service is orthodox, like the other funerals conducted at St. Elijah's, but differs in several ways. The slavanic language is used and different music, vestments and form of cross are used. This service takes from 35 to 40 minutes to conduct.

The contract under which the church claims was oral, being based on three conversations between the decedent and Father Karim between January, 1971, and September, 1971. Father Karim testified on the occasion of the first of these conversations that the decedent said, " * * * if you promise to give me a provo-slavanic funeral just like you gave my friend, then I will leave everything I have got to the church." Father Karim's response to this is shown in his testimony as follows:

"All right, so I told her that we would be happy to fulfill her wishes, whatever she wanted if this is really her will, that we would give her the provo-slavanic funeral and if she would leave everything to the church, that's fine, but make sure that *you don't leave it to Father Karim,* leave it to the church."

The second two conversations were to the same effect that if they would promise to give her a provo-slavanic funeral, she would leave everything to the church. A member of the church, who assisted Father Karim on his calls, and also the church secretary, overheard some of these conversations and confirmed Father Karim's testimony.

Father Karim, in September, 1971, wrote in longhand and signed a memorandum

which was placed in the church file as follows:

"September

On numerous occasions Dora Nahelka has made it clear to me that she desires to be buried through St. Elijah's Orthodox Church by me, or whomever the parish priest might be at the time.

She has stated emphatically that she wants a 'provo-slava' Russian orthodox funeral and will in turn leave all that she possesses to the church.

Therefore her desire must be fulfilled in time and in traditional orthodox fashion, even if St. Elijah's Church must pay for her funeral expenses.

I am leaving this note in her file in the event I am not around when her time comes.

Very Rev. Fa. Elias G. Karim."

Father Karim testified he had never made a memorandum of this nature on anyone else.

The decedent was given the type of funeral she requested. No will was ever found even though Father Karim had suggested she talk to a lawyer.

Her attorney of several years, who is now attorney for the coadministrators, had discussed with the decedent the making of a will prior to the time of the alleged oral contract involved here. He testified that he had tried to get her to make a will and talked to her about it, on many occasions. He testified he explained to her that if she made no will, her property might very likely go to the State of Oklahoma. He testified that her response to that was, "That's your problem, not mine."

The two friends and neighbors of the decedent who were appointed coadministrators of her estate testified on behalf of the State of Oklahoma. One of the coadministrators, Dr. Allan J. Stanley, Phd., a retired professor at the medical center, testified he had known the decedent since 1943 when he moved next door to her home and had visited with her off and on for 22 years. He testified he thought she was poor. He testified she did not tell him who she was going to leave her property to, but that she told him who she was not going to leave it to—and that was the church and her husband's relatives. He testified in effect that the only church that she ever mentioned to him was Corpus Christi Catholic Church.

The other coadministrator, Mrs. Mamie Webster, testified that she had known the decedent 30 years and for the last 12 years had lived just back of the decedent's home. She testified she never heard the decedent mention St. Elijah's Church, but that the decedent had told her she attended the Greek Orthodox Church while her husband was living.

The appellant asks reversal of the judgment under two propositions: First, it states that admission of evidence of payment by the coadministrators to the church of $100.00 for the funeral constituted error; and second, that the enforcement of the oral contract was not barred by the Statute of Frauds because of performance by the church.

■ As to appellant's first proposition, we note that after the funeral, the attorney for the coadministrator called Father Karim and wanted to pay the church $100.00 and Father Karim and another priest $50.-00 each. Father Karim testified that he told the attorney that due to the amount left in the estate, that he felt it was too little to be given to the church or the priests. $100.00 checks to each were admitted into evidence along with the attorney's letter which transmitted them. This letter simply indicated the checks were "covering your services and that of the church facilities" for the funeral.

This proposition is based on the rule that under 12 O.S. § 272, an affirmative defense of payment must be pleaded and that the evidence of payment in this case was not admissible since the State had filed only a general denial. We do not question this general rule on which appellant cites our decisions in *Higgins v.*

*Street,* 19 Okl. 42, 92 P. 155 (1907); *Ingram v. Oklahoma National Bank of Clinton,* 176 Okl. 544, 56 P.2d 406 (1936); *West Nichols Hills Presbyterian Church v. Folks,* 276 P.2d 255 (Okl.1954); and *Winton v. Myers,* 8 Okl. 421, 58 P. 634 (1899). However, we see no application of such rule in this case. The issue in this case was not whether or not payment of an obligation had been made. The issue here was whether there was an enforceable obligation. This issue was raised by the general denial to the appellant's claim. To the appellant's claim to the entire estate no affirmative defense is involved. This evidence was introduced not to prove that the coadministrators had discharged their alleged obligation to give the entire estate to the church, but rather for its relevancy to the only issue before the court, i. e., was there an enforceable oral contract. The precise distinction between evidence on an affirmative defense and evidence on the issues raised by the claims itself is spelled out in the *Ingram* case, supra. The issue in this case does not involve an affirmative defense and hence, the rule that an affirmative defense must be pleaded had no application here. This evidence was admissible, for whatever weight it might have, on the only issue before the trial court, i. e., was there an enforceable oral contract between the decedent and the church.

The appellant's second proposition, which raises the principal question in this case, is that the oral contract was not barred by the Statute of Frauds.

There is no question but that in Oklahoma the Statute of Frauds, 15 O.S.1971 § 136 is generally applicable to an oral contract to make a will. *York v. York,* Okl., 270 P.2d 656 (1953). The appellant's brief does not question this and many cases are cited to us where this Court has determined whether their particular facts situation was such that the bar of the Statute of Frauds would apply to an oral contract to make a will.

The basic position of the appellant is that under the particular facts of this case,

the bar of the Statute of Frauds does not apply because of the performance of the church of those things it promised or agreed to do. The appellant asserts that the performance of the church, i. e., the conducting of a provo-slavanic funeral, takes this case out of the bar of the Statute of Frauds. Appellant cites numerous cases on this proposition and cites specifically cases where this Court has held that the performance of certain services in compliance with oral agreement to make a will removes the bar of the Statute of Frauds. See *Purcell v. Corder,* 33 Okl. 68, 124 P. 457 (1912); *Eggstaff v. Phelps,* 99 Okl. 54, 226 P. 82 (1924); *Robinson v. Haynes,* 147 Okl. 95, 294 P. 803 (1931); *Holt v. Alexander,* 207 Okl. 140, 248 P.2d 228 (1952); and *Johnson v. Hazaleus,* Okl., 338 P.2d 345 (1959).

We see no necessity to discuss the details of these decisions. These decisions involved personal services to the decedent, usually over a considerable length of time.

Typical of these are cases where, as in the *Holt* case, supra, a person moves in with an older person and cares for them under an oral agreement. The basis of the exception that allows a performance to make an oral contract enforceable is that in certain fact situations, it would be inequitable to allow specific services to go unrewarded.

We distinguish these cases from the factual situation presented in this appeal. The factual difference is apparent. That this difference is legally significant is shown by the fact that in this case, the performance relied on (the funeral services) would have been performed regardless of whether there was a contract to make a will or not. In this case, we are asked to effect an exception to the Statute of Frauds that goes well beyond that done in any case cited to us from Oklahoma or any other jurisdiction.

■ In the *Robinson* case, supra, we said in our second syllabus:

"Before a court of equity will specifically enforce an oral contract to devise

property, the proof of the contract must be so cogent, clear, and forcible as to leave no reasonable doubt as to its terms and character."

We also said in that case:

"Whether equity will decree the specific performance of a contract rests entirely in judicial discretion and always upon the facts of a particular case."

What are the facts of this particular case? The essential fact was the conducting of a funeral. It was a thirty to forty minute religious funeral of a type conducted by this church and of a type particular to the faith of the decedent. We do not see how the fact that there were differences in this funeral from other funerals or most funerals could have any effect on the legal issue in this case.

On the question of the effect of performance involved here, the real issue is whether the action was taken because of the contract or would the act have been performed anyway. Did the church perform the funeral to comply with its agreement? Tests referred to by the court and discussed by the parties in the briefs center around such words and expressions as "detriment", "reliance" and "change of status quo." In examining these matters, we must come to the question of whether the church performed some act that it would not have performed except for the promise of the decedent to leave her estate to the church. Such a question is suggested in 73 Am.Jur.2d, Statute of Frauds, § 496, page 121 as follows:

"The evidence must make it clear that the services relied upon as constituting part performance were performed because of the contract to devise or bequeath, and that they would not have been furnished unless on account of that very agreement and with a direct view to its performance."

To the same effect, see 73 Am.Jur.2d, Statute of Frauds, § 491, page 116. We see no reason why this basic consideration would not also be involved where there was a full performance.

There is no question that the acts performed by the church in this case would have been performed by the church even though the alleged agreement to make a will had not been made. Father Karim testified on cross-examination as follows:

Q. As a matter of fact, you have performed this very same service for other people, I believe you testified, when they haven't paid for it?

A. Very definitely, yes.

Q. Then when you are performing this service, whether it be for Mrs. Nahelka or for anyone else in your parish, when they request it, you would perform that service?

A. Very definitely true.

Q. And it would not depend on any promise or otherwise as far as you are concerned?

A. That's true. As long as that is what they wanted.

Q. And you would have performed this service for Mrs. Nahelka if she hadn't any money at all, would you not, Father?

A. We would have even paid for the funeral, if necessary.

Having concluded that the alleged oral contract is unenforceable, we need not examine into whether the conversations here actually created a contract or were mere expressions of desires and intentions. We can only speculate as to what the decedent's intentions and thinking were, however, the fact remains that she did not make a will. This was an equity case for specific performance and we are of the opinion that the judgment of the trial court was not against the clear weight of the evidence.

The judgment of the trial court is affirmed.

WILLIAMS, C. J., HODGES, V. C. J., and BERRY, LAVENDER, BARNES and SIMMS, JJ., concur.

IRWIN and DOOLIN, JJ., dissent.