2001 OK CIV APP 105

**In the Matter of the ESTATE OF Verleen L. WHITE, deceased.**

**Marshall Ray Hand, Plaintiff/Appellee,**

v.

**Henry O. Warlick, Personal Representative of the Estate of Verleen L. White, deceased, Defendant/Appellant.**

**No. 94,290.**

Court of Civil Appeals of Oklahoma, Division No. 2.

July 17, 2001.

Robert C. Thompson, McKinney & Stringer, P.C., Oklahoma City, Ok, for Appellee.

William F. Collins, III, Bellingham, Collins & Loyd, P.C., Oklahoma City, Ok, for Appellant.

REIF, Vice Chief Judge:

¶ 1 This appeal concerns the trial court's approval of a claim against the estate of Verleen L. White. The claim was made by Marshall Ray Hand who lived with Mrs. White from 1992 until her death in May 1998. Mr. Hand's claim was based on an alleged oral agreement with Mrs. White that Mr. Hand says was made just prior to the time the couple began living together. Mr. Hand testified that he sold his home and moved in with Mrs. White based on her promise that he would receive her home if she died before he did. Mr. Hand also testified that he did a considerable amount of work to maintain and improve the residence and yard, in addition to the companionship and care he provided in their living arrangement. In addition to his testimony, Mr. Hand also called a neighbor who lived nearby during the time Mr. Hand and Mrs. White lived together. This neighbor testified to instances where Mrs. White used "our" to refer to the house, the yard, and certain improvements. This neighbor also related that Mrs. White told him, "It's [Mr. Hand's] house, too" when the neighbor asked, "Well, what happens if something happens to you [Mrs. White]?"

¶ 2 The trial court found Mr. Hand's evidence to be so clear and cogent that the trial court entertained no doubt that the parties entered into the agreement, that Mr. Hand fully performed the agreement and that Mr. Hand should recover the value of the residential property. After a motion for new trial was unsuccessful, the personal representative of the estate brought this appeal.

¶ 3 On appeal, both the personal representative of the estate and Mr. Hand acknowledge that this case is one of equitable cognizance. They each cite *Johnson v. Hazaleus,* 1959 OK 62, 338 P.2d 345, as representative of the case law guidance for recognition and enforcement of an oral contract to devise property. They agree that the *Johnson* case provides that "proof thereof must be so cogent, clear and forcible as to leave no reasonable doubt as to its terms and character." *Id.* at ¶ 19, 338 P.2d at 348 (citations omitted). The parties differ sharply, however, on the issue of whether Mr. Hand has met this

burden and has satisfied other requirements in order to prevail.

¶ 4 The personal representative generally contends that the *Johnson* case is representative of the extent of proof necessary to meet the burden of "so cogent, clear and forcible as to leave no reasonable doubt." The personal representative argues that the testimony of Mr. Hand and the neighbor in the instant case does not come close to meeting the level of sufficiency reflected in *Johnson*.

¶ 5 In *Holt v. Alexander*, 1952 OK 296, ¶ 6, 248 P.2d 228, 230 (per curiam), the supreme court undertook "to determine just what evidence has been recognized by the courts as sufficient to meet the [so cogent, clear and forcible as to leave no reasonable doubt] requirement." The *Holt* case looked to *Fox v. Fox*, 117 Okla. 46, 245 P. 641, 644. In Fox, *ten witnesses* who had known the decedent for more than 30 years testified that he had always spoken of the land in question as plaintiff's land. The evidence in *Fox* also showed that the plaintiff had stayed with the decedent, worked his farms and helped pay off mortgaged debt of the decedent. The supreme court ruled that the evidence in the *Holt* case established a contract to devise property "as clearly as, if not more clearly than, the evidence in the *Fox* case." *Holt*, 1952 OK 296, ¶ 7, 248 P.2d at 231.

¶ 6 In *Holt*, the plaintiff-daughter quit a job she had held for sixteen years and moved into the residence of her mother and stepfather. The evidence showed that plaintiff's mother and stepfather were in poor health. Plaintiff-daughter lived with and cared for them, prepared meals and cleaned the house from February 1941 to June 1949, when her mother and stepfather died. The court noted that "various witnesses" corroborated the fact that plaintiff looked after her mother and stepfather until they died, and that the stepfather had made statements that "he was going to leave [plaintiff] the property," plaintiff "was to get the place," plaintiff "would fall heir to his property," "this is going to be [plaintiff's] home when we are gone" and the residence "was to be [plaintiff's] home when they had no more use of it." *Id.* at ¶ 3, 248 P.2d at 230.

¶ 7 The question of whether an oral contract to devise has been sufficiently proven is not answered, however, solely on the basis of the number of witnesses, the statements of the deceased-promisor and the provision of services by the plaintiff-promisee. In *York v. York*, 1953 OK 336, ¶ 9, 270 P.2d 656, 658 (citations omitted), the supreme court said, "where there is no note or memorandum of the agreement in writing, performance by the parties seeking its specific performance will take the agreement out of the Statute of Frauds ... but such performance must be *clearly referable* to the contract and must consist of services whose character is exceptional and extraordinary and whose value cannot be fairly estimated by any pecuniary standard, or it must appear that the promisee's 'whole course of life was changed' by his performance."

¶ 8 The court in *York* further observed that: "The acts of the parties and the equities arising therefrom are the real basis of equitable relief and for their acts to be 'referable' to their contract, they must point clearly and exclusively to the existence of that particular contract or one of the same general tenor." *Id.* at ¶ 9, 270 P.2d at 659 (citations omitted). The court further explained, "[C]onduct which can be reasonably explained without reference to such an oral contract does not usually constitute the 'performance' required. 'What is done must itself supply the key to what is promised.' " *Id.* (citation omitted). The court concluded by saying, "it should appear with reasonable certainty that the services would not have been performed but for the oral agreement." *Id.* at ¶ 10, 270 P.2d at 659.

¶ 9 In the *York* case, the plaintiff was the nephew of the deceased. Over a period of twenty years, plaintiff and his uncle lived in the same household, although not always on the farm owned by the uncle. From September of 1947 to January 1952, plaintiff, his wife and uncle lived on the uncle's farm. During this time, plaintiff and his wife took care of the farm and attended to some of uncle's needs. However, the evidence also reflected that plaintiff paid his uncle the customary farm rent crop, and plaintiff and his wife did not attend to all of uncle's needs

and affairs. The court noted that uncle purchased groceries, sometimes paid to have laundry done outside the home, and was "probably more capable than plaintiff" with respect to paying bills and taxes, and looking after business matters entailing no heavy manual labor.

¶ 10 Without diminishing the importance or benefit of the services provided by plaintiff to his uncle, the court concluded "plaintiff was little more than a combination tenant, confidant, errand boy and/or chauffeur [and] each did favors for the other that were reciprocated, not because of any feeling of contractual obligation, but from motives of mutual love, affection and helpfulness." *Id.* at ¶ 12, 270 P.2d at 660. The court further stated that, "[l]ooking at the personal services furnished his uncle by the plaintiff and his wife, against the background of their previous and continued relationship and association, it is difficult if not impossible to find anything the latter did for the uncle after he made the promise attributed to him that they would not have done otherwise." *Id.*

¶ 11 Even if we accept Mr. Hand's testimony that Mrs. White promised to leave him the home, and give weight to the neighbor's testimony that Mrs. White used "our" and "his" to refer to the home, we do not believe the evidence concerning Mr. Hand's services points clearly and exclusively to the existence of a contract to devise property. We find that his services were *not* "exceptional and extraordinary" in the context of the spousal-type relationship that the parties maintained. Further, we are unable to conclude that it "appear[s] with reasonable certainty that the services would not have been performed but for the oral agreement." We think Mr. Hand's testimony on cross-examination sums up why he did work—"because it needed to be done, and I was helping Miss White have a decent place to live."

¶ 12 Like the court in *York*, we find that Mrs. White and Mr. Hand "each did favors for the other that were reciprocated, not because of any feeling of contractual obligation, but from motives of mutual love, affection and helpfulness." Our conclusion in this regard is reinforced by evidence showing that Mrs. White paid for or reimbursed Mr. Hand for *most* of the monetary expenses associated with his services and improvements.

¶ 13 In reaching this conclusion, we are not unmindful that Mr. Hand sold his house in order to live with Mrs. White. In doing so, however, we do not believe that his "whole course of life was changed," as is contemplated by *York* and illustrated by *Holt*. We observe that the sale of his home actually facilitated their mutual desire to live together and relieved Mr. Hand from the burden and expense to keep up his home and ten acres. Furthermore, Mr. Hand did not indicate that he used any of the proceeds of this sale to maintain and improve Mrs. White's residential property. It appears that he actually saved or preserved the proceeds throughout the time he lived with Mrs. White.

¶ 14 Interestingly, Mr. Hand testified that if he "went first she got what I had. If she went first, I was to get that place for the work I had done on it." However, Mr. Hand did not explain how Mrs. White would have gotten what he had. Such an explanation was necessary in view of his admission that they did not marry, they neither intended nor professed to have a common-law marriage, and they maintained separate accounts. If Mr. Hand had predeceased Mrs. White, it is doubtful that Mrs. White could have successfully pressed any claim against Mr. Hand's estate without a testamentary instrument or some written evidence of this agreement, like the handwritten and signed instrument in *Johnson v. Hazaleus*, 1959 OK 62, 338 P.2d 345.

¶ 15 Like the court in *Pierce v. Johnson*, 1954 OK 309, ¶ 5, 277 P.2d 682, 683, we hold that the evidence presented by Mr. Hand did not meet the requirements set forth in *York*. Therefore, it was error for the trial court to recognize and enforce the alleged oral contract to devise property. This holding, however, does not mean that Mr. Hand has no recovery from the estate for improvement of the residential property. We are satisfied that he has established a basis for his alternative claim of quantum meruit. *See Pancoast v. Eldridge*, 1928 OK 653, 273 P. 255, 256. He is entitled to recover for the work and improvements he did that enhanced the value of the property. We

expressly limit his recovery to the work and improvements that enhanced the value of the property, because we find that his services to cook, clean, and drive Mrs. White places were done as part of the domestic life and relationship that the parties intended to have and share. Accordingly, we reverse the judgment in favor of Mr. Hand on the alleged oral contract to devise property, but remand with directions to the trial court to determine the *reasonable* value of the services of Mr. Hand that enhanced the value of the property.

¶16 REVERSED AND REMANDED WITH DIRECTIONS.

¶17 GOODMAN, P.J., and COLBERT, J., concur.