In the Matter of the **ESTATE OF Emza L. DILLING, Deceased.**

No. 52023.

Court of Appeals, of Oklahoma, Division No. 2.

March 24, 1981.

Rehearing Denied April 16, 1981.

Certiorari Denied Aug. 26, 1981.

Released for Publication by Order of Court of Appeals Sept. 3, 1981.

Ernest F. Godlove, Edward W. Dzialo, Jr., Godlove, Joyner, Garrett, Myers & Mayhall, Inc., Lawton, for appellants.

Ernest J. Istook, Jr., Oklahoma City, for appellee.

BOYDSTON, Judge.

This case begins in the early 1900's when Elmer and Emza Dilling, husband and wife, moved to Fletcher, Oklahoma. Elmer became the primary stockholder and president of the First National Bank of Fletcher. When Elmer prepared his will, the couple had only one daughter, Jane, to whom he left $50. The rest of his estate was to go to his wife Emza.

The couple later had a son, Jerome, but the original will was never changed to reflect this. In 1937, when his son was 20 years old, Elmer died. Jerome, being a pretermitted heir, inherited one-third of his father's estate.

On reaching majority Jerome assigned his interest in his father's estate to his mother, Emza, allegedly to comply with an oral agreement he had made with her under which she was to will one-half of her estate

to him at her death. The written assignment from Jerome to his mother is silent as to any agreement between them, reciting only "[I]n consideration of the sum of one [$1.00] Dollar and other valuable consideration . . . ."

The assignment gave Emza control of the bank over the next three decades. Jerome worked at the bank until 1962, at which time he divorced his wife and left the town of Fletcher.

In 1962 Emza prepared a will that left one-half of her estate to her daughter Jane, a small legacy to Jerome and the residue to Jerome's children.

In approximately 1971 Jane initiated legal proceedings to have the mother declared incompetent and to have herself named as legal guardian. As guardian she discovered among her mother's papers the 1962 will.

She contacted Jerome and together they went to the rest home where their mother lived and had a new will drawn up for her which divided the property equally between them except for certain small legacies which were to be left to the grandchildren.

Emza Dilling died in September of 1973. Her 1971 will was offered and accepted for probate. On appeal the Oklahoma Supreme Court reversed the trial court and held the will to be invalid.[1]

The 1962 will was then offered for probate. Jerome objected to distribution of Emza's estate under the 1962 will asserting that under the terms of the alleged 1938 oral contract with his mother he was entitled to one-half the estate.

In support of Jerome's claim he introduced a 1963 letter wherein Emza told him she couldn't sell her bank stock and continue to support herself. That letter also asked Jerome "[G]et yourself straight and come back to your family." The letter also said, "[W]hen I'm gone you will get your part."

---

1. *In the Matter of the Estate of Dilling*, Case No. 47,416, the court held, reversing both the trial and appellate court:

Thus, it is apparent that there was present in this case undue influence exerted by the appellees (Alice Griffith and Jerome Dilling) over their mother, which destroyed the free agency of the testatrix at the time when the instrument was made and which, in effect, substituted their will for her will.

The trial court upheld the oral contract and awarded one-half of Emza's estate to Jerome. His children now challenge that ruling claiming that the court's finding that the oral contract was valid is contrary to the law and evidence. We agree.

■ In Oklahoma an oral contract to devise property upon death can be enforced by the promisee.[2] The law is also well settled that before an oral contract to devise property will be enforced, the proof as to its existence must be clear, cogent and forcefully convincing so as to leave no doubt as to its existence, terms and character.[3] On appeal the appellate court must weigh the evidence and unless the judgment of the trial court is clearly against the weight of the evidence the judgment will not be disturbed.[4]

A survey of the cases shows the courts are, and rightly so, very skeptical of such claims. They almost always involve situations where the decedent's estate is claimed by one who is neither a testamentary nor statutory heir. The decedent cannot testify, rebut or explain the conduct, conversations or facts on which the claim is based. However, there are a few cases having facts such that an inflexible legal bar would truly work an injustice. Therefore, while the judicial door is left cautiously open, it is "safety-chained" by the "clear, cogent and convincing" evidentiary test.[5] The standards of this test require such a degree of evidentiary reliability and persuasiveness that its rigor is exceeded only by the standards set for overcoming "reasonable doubt."[6]

■ Applying these standards we test and weigh the evidence and find it falls far short of the goal.

Jerome's strongest case is, and under the circumstances should be his own testimony. He is the only available witness to the transaction to testify regarding the terms of the agreement and, in fact, its very existence. The following is the direct testimony he offered in proof of his claim:

Q. In an effort to obtain your relinquishment, did they make—did she make an agreement with you to do certain things?

A. Yes.

Q. What did she agree to do?

A. Well, she said that if I'd sign it back to her that she'd take care of the property for me and that she'd leave it to Jane and I, half and half, when we were—when she was through with it; and, that's the way she put it, you know, "leaving," when she was through with it which presumably meant at her death; and, I said, well, that—I hadn't gone through school yet and I needed, you know, some—needed the property now. And, so, finally, through negotiation, why, she finally agreed, well, that— that I had sent Jane through college, that they'd send—that she'd see that I got through college, if I'd sign it back, and she'd take care of the property.

Q. The facts were that Jane had already gone through college—

A. Right.

Q. While her father was alive?

A. Uh-huh.

Q. *So what was the final agreement?*

A. Well, the *final agreement* was that— course, that *I'd return the property to her and she would take care of it*

**2.** *Bleakley v. Bowlby*, Okl., 557 P.2d 894 (1976); *Staton v. Moody*, 208 Okl. 372, 256 P.2d 409 (1952); *Fox v. Fox*, 117 Okl. 46, 245 P. 641 (1926).

**3.** *Robinson v. Haynes*, 147 Okl. 95, 294 P. 803 (1930).

**4.** *Nisbet v. Midwest Oil Corporation*, Okl., 451 P.2d 687 (1968); *Hurst v. Stowers*, Okl., 399

P.2d 477 (1965); *McCrory et al. v. Evans*, 192 Okl. 649, 138 P.2d 823 (1943).

**5.** *Majors v. Majors*, Okl., 263 P.2d 1012 (1953). Oral contract must be corroborated by surrounding facts and circumstances.

**6.** *Jones v. Tautfest*, 206 Okl. 394, 243 P.2d 1003 (1952) Rules as to weight of evidence must be applied with "utmost strictness."

*and then she would see that I got through college.*

Q. Alright. Did you sign a paper relinquishing your interest in that estate—

A. Yes. (emphasis added)

The above direct testimony is the most "clear, cogent and forcefully convincing" evidence offered by Jerome to prove his case.[7]

Jerome offered the testimony of Mae Etharidge who was the night attendant for his mother from 1969 until her death at the age of 93 in 1971, a period of time during which the mother was apparently incompetent.

Her testimony was offered to show a consistency in donative intent on the part of the mother. From a fair reading of the transcript she appears to be a very pliant witness whose testimony added nothing to the case which could be considered clear or cogent. Her strongest testimony in support of Jerome's claim was:

Q. O.K.; But did she discuss it prior to 1971 that her property was to be divided equally between her two children?

A. No; what she would say was, "I have it for Jane and Jerome."

In reviewing the strongest points of Jerome's proof in his case-in-chief we conclude the only evidence that a contract existed to devise one-half of the estate to himself is his own testimony. This transaction occurred more than 40 years before trial. Part of the transaction, Jerome's transfer of one-third of the estate, was meticulously preserved in writing. We are asked to find that there was another agreement made simultaneously to devise property which was wholly oral.

The existence of this "contract" was not mentioned to anyone else by Jerome or his mother for 47 years. It did not surface until after the supreme court's rejection of the 1972 will. When you read Jerome's testimony, the final agreement was literally "I'd return the property to her and she'd take care of it and then she would see that I got through college." Even this does not contain a promise to devise one-half of the estate to anyone. It merely promises to send the lad to school.

Testimony by the night attendant is not corroborative of any issue. Although such evidence of the mother's state of mind is not inconsistent with Jerome's claim it is too remote in time to have a rational bearing on whether she actually made the oral contract more than 40 years earlier.

Contrasting Jerome's proof, since we must weigh all the evidence, with that presented by his children, we find an unequivocal denial that the transaction occurred. Jerome's former wife testified she was his fiance at the time his inheritance was discussed and was privy to the facts surrounding the assignment and had personal knowledge of the transaction.[8] If she had a personal bias or prejudice toward her former husband it was not brought out at trial.

We also consider that the custom of personal dealing between the parties appears to be inconsistent with Jerome's theory. We know when the initial estate transaction was made it was carefully written and executed by the mother and son. A few years later when the son was living out of state and she encouraged him to return to

---

7. It should be observed that on several other occasions Jerome's lawyer phrased his version of terms of the contract in grossly leading questions to which the response was "yes." Answers to leading questions are accorded much less weight than witness' personal account of the transaction.

8. Jerome's former wife is mother of appellants. We are not unmindful of her indirect interest in the outcome of the litigation because of the natural interest in seeing her children benefited by the potential inheritance. But, from an evidentiary "weighing" stand point we believe that indirect parental benefit cancels itself out since both the witness and her ex-husband presumably share the same interest as parents. She certainly has much less to gain pecuniarily from biased testimony than Jerome. Rather, her testimony has a "ring of truth" and an internal consistency not found in Jerome's testimony.

help her manage the bank, this "return" agreement was executed in writing as to all its terms and conditions. It is apparent from the tone and tenor of that agreement the parties did not take details of family business for granted. Rather, the opposite conclusion is more probably true. There was no "hand-shake" relationship between parent and child. It should be noted that in every instance where Jerome had anything to do with the bank stock, it was always referred to as *her* stock. When bank shares were transferred to him during his employment at the bank, the transfer was treated as a sale. Likewise, when the shares were transferred back to her this was also treated as a sale. It is interesting to note that throughout their mutual dealings with the stock, in no instance did Jerome refer to the stock as *his* stock, (albeit once removed) with the enjoyment of his benefit merely being delayed until the death of his mother. Up to the time of her death he offered to "buy" the stock. Logically, one might well question whether a person, having an absolute contractual right to inherit an asset would make concerted efforts to buy that asset from a 93 year-old, seriously ill devisee. This manner of dealing with the bank stock and with his mother regarding other business affairs is inherently inconsistent with his claim of ownership by contract right. More important, it casts clouds of doubt over his explanation of lack of a written contract in the first place.

In contrast, his former wife testified he was paid for the assignment. They got married shortly thereafter using the money as a "nest egg" to complete college and to buy a Packard automobile. She denied there was an oral contract and stated the assignment was brought about by reason of a cash settlement totaling $3,000. This was first denied by Jerome, but later admitted in a round about way. He testified:

Q. And you insisted upon having, then, three notes signed?

A. Yes.

Q. Then your mother actually gave you, then, three notes?

A. Right.

Q. Signed by her?

A. Right.

Q. So this wasn't just $900 [$900 × 3 = $2,700] that she paid you out of the goodness of her heart over a period of time on some years, this was rather in payment of three notes that you got at the time of the assignment, is that right?

A. Right.

Q. And although you got an assignment signed and you got three notes signed by trusting mother, you don't have the contract in writing from your mother where she said that she would give you half of the estate, is that right?

A. That's correct. Because you wouldn't—

Q. And you were—

A. I wouldn't demand that of my mother.

So we have a mother and son negotiating over a serious transfer of assets where on the one hand the son insisted upon obtaining three $900 notes signed contemporaneously with the execution of the assignment, and on the other hand where the very serious matter of the beneficial ownership of the assets to be preserved for the son as an inheritance was concerned he now urges that this was a matter too delicate for him to insist on being written.

Rather, we think the former wife's testimony is much more consistent with the facts. It appears more likely and more probably true that there was in fact a $3,000 cash settlement made at the time of the assignment and that was the only consideration. It appears that the present claim is merely an "after-thought." It is an attempt to obtain what was otherwise impossible through the ordinary expectations of care and affection from his mother which had obviously been alienated many years before because of the break up of his family.

We hold the trial court erred. The clear weight of the evidence favors Jerome's children. The claim of oral contract by Jerome

was not proven by a preponderance of evidence and certainly not by the clear, cogent, convincing standard required.

We reverse the trial court's decision and order the trial court to enter judgment for appellants and tax costs of this appeal to appellee.

BRIGHTMIRE, J., concurs.

BACON, P. J., dissents.

BACON, Presiding Judge, dissenting.

The problem in cases such as the one before us is that one party to the oral contract is deceased, and under such circumstances it is usually difficult to prove an oral contract. Therefore, all surrounding circumstances should be examined in determining if one was in fact made.

In the present case, the evidence supports a conclusion that Emza and Jerome did in fact orally contract as he alleges. While it is true that possibly much stronger and clearer evidence would have been more desirable the evidence does establish that an oral contract existed.

Jerome's father died testate in 1937. He was not named in his father's will and without question he was entitled to one-third of his father's estate as a matter of law. Jerome assigned his one-third interest to his mother for one dollar and other valuable consideration. Hindsight tells one that he should have set forth the agreement in writing—that was not done. However, it is undisputed that Jerome and his mother did negotiate with each other at least several months before the assignment was executed. His father's estate was substantial and any claim that he simply assigned away his share of inheritance for one dollar and received no promise of anything in return is doubtful if not unbelievable. In addition to these facts there is a letter written by Emza to Jerome in 1963 wherein she assured him that he would get his share of her estate when she died. This, we think, shows that an earlier agreement existed between Emza and Jerome. Further, there is testimony from an impartial witness who stated that Emza had told her that Jerome and his sister Jane would inherit her estate.

The only evidence rebutting appellee's claim of an oral agreement is the testimony of Jerome's ex-wife. Her testimony is not that positive and in addition it is somewhat self-serving for the obvious benefit to be received by her children.

In reviewing all of the above evidence and considering all of the surrounding circumstances of this case I conclude that the judgment of the trial court is not clearly against the weight of the evidence and would affirm its judgment.